William M. Fischbach (admitted *Pro Hac Vice*)
Elliot C. Stratton (admitted *Pro Hac Vice*)

**TB TIFFANY & BOSCO** P.A.

SEVENTH FLOOR CAMELBACK ESPLANADE II
2525 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-4237
TELEPHONE: (602) 255-6000
FACSIMILE: (602) 255-0103
EMAIL: wmf@tblaw.com; ecs@tblaw.com

Chad L. Butler, (CBN 270888)

**TB TIFFANY & BOSCO** P.A.

1455 FRAZEE ROAD, SUITE 820
SAN DIEGO, CALIFORNIA 92108
TELEPHONE: (619) 501-3503
FACSIMILE: (619) 487-9079
EMAIL: clb@tblaw.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| Peter Kuhn, personally and in his capacity as trustee of the Kuhn Trust,<br><br>Plaintiff,<br><br>vs.<br><br>Three Bell Capital, LLC, a California Limited Liability Company; Jonathan Porter, a Married Man,<br><br>Defendants. | Case No.: 5:23-cv-02958-PCP<br><br>**SECOND AMENDED COMPLAINT**<br><br>Jury Trial Demanded |

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Peter Kuhn ("Plaintiff"), personally and in his capacity as trustee of the Kuhn Trust, is a citizen of Maricopa County, Arizona.

2. Defendant Jonathan Porter ("Porter") is a married man and a citizen of Los Altos, California.

3. Defendant Three Bell Capital, LLC ("Three Bell") is a California Limited Liability Company with its main office located in Los Altos, California. Porter is the co-founder and CEO of Three Bell Capital, LLC. At all relevant times, Porter was acting as a principal, agent, and/or employee of Three Bell.

4. Three Bell and Porter are referred to collectively as "Defendants."

5. At all relevant times, Defendants were acting in concert and/or mutually aiding and abetting one another to commit to conduct alleged herein.

6. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332.

7. Venue is proper in the Northern District of California because Defendants are located in this District.

8. Divisional assignment. Because the lawsuit arose in Santa Clara County, it should be assigned to the San Jose Division of this Court.

**GENERAL ALLEGATIONS**

9. Three Bell is a Registered Investment Advisor ("RIA") with 18 employees located in Los Altos, California.

10. Porter is an RIA at Three Bell.

11. Three Bell has roughly $3 billion in assets under management.

12. Three Bell advises high net-worth individuals regarding their investment needs.

13. Three Bell professionals, including Porter, maintain securities licenses which are subject to supervision by the SEC and FINRA.

14. As RIAs, Defendants owe fiduciary duties to their clients.

15. Those fiduciary duties include, without limitation, assisting clients with reviewing, conducting diligence on, and monitoring investments as well as providing opinions on these investments, their performance, their long-term viability, and their suitability relative to a client's financial goals.

16. Defendants owe fiduciary duties to their clients to act in good faith, disclose information regarding investments, and act solely in the best interests of their clients.

17. Defendants owe fiduciary duties to their clients that require disclosure of potential conflicts of interest.

18. Plaintiff and Porter first met in California in late 2019 at dinner with mutual contacts.

19. Subsequently, on February 25, 2020, Porter sent an unsolicited e-mail to Plaintiff recommending that he invest in "FTM Medical Accounts Receivable Litigation Finance Fund" (the "International Fund"). *See* **Exhibit A**.

20. Based on this solicitation, Plaintiff agreed to invest $200,000 in the International Fund.

21. Later on February 25, 2020, Three Bell's Operations Associate Marley Dickson sent Plaintiff an email to facilitate Plaintiff's investment in the International Fund and to open a client account with Three Bell. *See* **Exhibit B** and **C**.

22. Dickson also sent Plaintiff the subscription agreement for the International Fund for execution via DocuSign. *See* **Exhibit D**.

23. Dickson specifically requested documentation from Plaintiff to open an account "under Three Bell's management and invest into FTM Medical Receivables." *Id*.

24. At Defendants' direction, Plaintiff listed Three Bell as his "authorized agent" when he executed the subscription agreement for the International Fund. *See* **Exhibit E**.

25. Porter sent an email to Plaintiff stating "thanks for moving quickly on this. It is normally very difficult to get into this fund, and I'm excited to have gotten you . . . into it." *See* **Exhibit F**.

26. Three Bell and Porter made no disclosures to Plaintiff regarding any conflicts of interests relative to the International Fund.

27. Three Bell and Porter made no inquiries of Plaintiff's risk threshold and whether the International Fund was beyond Plaintiff's threshold.

28. The International Fund was managed by Griffin Asset Management ("GAM").

29. Porter had a close relationship with GAM's sole manager, Michael Griffin ("Griffin").

30. Based on this close relationship, Three Bell was the primary source of funds for the International Fund. In 2020, roughly two thirds or more of the International Fund's $18 million was from Three Bell/Porter's clients.

31. Defendants recommended to their clients that they invest in the International Fund, yet failed to conduct the required due diligence on the International Fund prior to recommending it to clients.

32. On information and belief, Porter was himself invested in the International Fund and, through inside contacts, had become aware of looming financial troubles for the International Fund in early to mid-2020, but failed to disclose this Plaintiff and other Three Bell clients.

33. On information and belief, Three Bell is a sponsor, general partner, or managing member of pooled investment vehicles that also invest in securities recommended to clients, including the International Fund.

34. Accompanying Three Bell's SEC ADV Form is a brochure stating that Three Bell discloses all conflicts of interest under Section 260.238(k) of the California Corporations Code, which requires the disclosure of ownership of similar securities as its clients.

35. Defendants failed to disclose to Plaintiff their investments in the International Fund.

36. On information and belief, Porter and Three Bell were aware that in 2019, the International Fund had made several loans to Infinity Capital Management, Inc. ("Infinity").

37. These loans were reflected in a Second Amended & Restated Loan and Security Agreement and Promissory Note (the "MLA"). The International Fund held a perfected security interest in all of Infinity's personal property as collateral for all loans, past and future, made under the MLA.

38. In entering into the MLA, Infinity was entering into an exclusive relationship so that Infinity would only secure assets and medical receivables on behalf of the International Fund.

39. Infinity began to fraudulently sell and assign some of these accounts receivable to Tecumseh–Infinity Medical Receivables Fund, LP ("Tecumseh") in knowing violation of the MLA.

40. As stated above, Porter became aware of this misconduct by Infinity in early to mid-2020, which rendered amounts loaned under the MLA unsecured and uncollectable, but never disclosed this to Plaintiff, thereby violating his fiduciary duty.

41. Infinity's looming financial troubles was available in documentation available to Porter, including Infinity's Independent Auditor's Report dated December 31, 2019 (the "2019 Report"). See **Exhibit G**.

42. The 2019 Report's Going Concerns specifically stated: "The Company's ability to continue as a going concern is dependent on the ability to generate revenues and raise capital. The Company has not generated sufficient income from its medical lien funding to provide sufficient cash flows to enable the Company to finance its operations internally . . . These factors raise substantial doubt about the Company's ability to continue as a going concern within one year from the date of filing." See **Exhibit H**.

43. As RIA's, Defendants had a duty to investigate the 2019 Report and disclose the Going Concerns to their clients prior to recommending investment in the International Fund.

44. Three Bell and Porter failed to investigate or disclose this Going Concern to Plaintiff.

45. Upon information and belief, Three Bell and Porter had monthly management meetings with GAM.

46. Upon information and belief, Griffin informed investors, including Three Bell and Porter, that the Infinity's loans had a "zero probability" of defaulting.

47. As RIA's, Three Bell and Porter had a duty to investigate these claims and inform their clients, because after the 2019 Audit's Gong Concerns, any claim of "zero probability of defaulting" raises serious questions regarding continuing operations.

48. GAM was charging Three Bell and its clients above market rates for GAM's performance fees.

49. Porter requested that Griffin put GAM's performance fees in line with the market rates.

50. Griffin refused, and unilaterally increased GAM's performance fees.

51. Griffin also threatened Porter that he (Griffin) would take all of Three Bell's assets—to include funds invested by Plaintiff and other Three Bell clients—if he (Griffin) desired.

52. Neither Three Bell nor Porter made any disclosures to Plaintiff or other clients regarding Griffin's excessive fees and threats.

53. Upon information and belief, Porter—aware of the looming financial troubles at the International Fund—was concerned that Griffin would to tap into Three Bell's client's principal investments in the International Fund.

54. Upon information and belief, this left Porter with a decision: Porter could disclose to Three Bell clients, including Plaintiff, the looming troubles at the International Fund, thereby causing a "run" on redemptions from the International Fund and potentially exposing Porter's failures to disclose conflicts of interest. Or, instead Porter could violate his fiduciary duties by concealing the International Fund's precarious financial position

1  from Three Bell clients and instead attempt to quietly and gradually transfer client funds
2  into another GAM investment fund. Porter opted for the latter.

3  55.  On or about July 20, 2020, Porter contacted Plaintiff and another
4  International Fund investor Mark Parelius and suggested that their funds be moved from
5  the International Fund to the "HedgeACT (HA) Select-Medical Receivables Litigation
6  Finance Fund Domestic" ("Domestic Fund").

7  56.  The Domestic fund was also managed by GAM.

8  57.  Porter cited higher returns and a more diverse borrower base in the
9  Domestic Fund as the basis for his recommendation. *See* **Exhibit I**.

10  58.  In reality, the International Fund was, at the time, experiencing a high rate
11  of return for investors. But Porter was attempting to quietly and gradually transfer client
12  funds out of the International Fund because of the looming default by Infinity, all without
13  disclosing the truth to Three Bell clients.

14  59.  Porter advised Plaintiff that Three Bell would handle the documentation to
15  facilitate the redemption of Plaintiff and Parelius' funds in the International Fund and
16  transfer those funds to the Domestic Fund.

> We have been waiting for HedgeAct to produce the paperwork necessary to effectuate the switch from [the International Fund] to [the Domestic Fund]. Part of that delay was that we were insistent that our investors not be subject to a new liquidity clock by switching into the new fund. We also had to negotiate out some provisions…. That paperwork is now complete and we are preparing it for 8/1 switchover, for both you and Mark. Thanks for your patience, as we waited for HedgeAct to produce the requisite materials.

*See* **Exhibit J**.

23  60.  Porter thus knowingly and explicitly represented that he could facilitate the
24  transfer of funds.

25  61.  Porter subsequently advised that the transfers would have to be staggered,
26  with the first move on August 1, 2020, and the second on September 1, 2020 based on
27  alleged Domestic Fund capacity. *See* **Exhibit K**.

28

7

62. Porter's claim that the transfers had to be "staggered" was false. In reality, Porter could have transferred Plaintiff and Parelius' funds simultaneously, or even advised them to do so on their own. But Porter, in an effort to conceal his conflict of interest, was attempting to make the transfer quiet and gradual to avoid a "run" on redemptions from the International Fund.

63. Porter stated that "[o]rdinarily I would just make the call and disappoint one person, but since you are such good friends, and both asked me to switch at functionally the same time, I wanted to ask who I should put in for 8/1 vs. 9/1." *Id.*

64. Porter left the decision as to the order of transfer to Plaintiff and Parelius. It was later agreed with Three Bell that Porter would transfer Parelius' funds first on August 1, 2020 and move Mr. Kuhn's funds subsequently on September 1, 2020.

65. Defendants transferred Parelius' funds to the Domestic Fund as agreed, and Parelius recognized significant gains in the Domestic Fund.

66. On September 21, 2020, Plaintiff inquired with Porter if his investment had been moved to the Domestic Fund. Porter responded, "If they had capacity, then yes. All the docs were submitted properly last time. I will check with the fund today and confirm." *See* **Exhibit L**.

67. In reality, Defendants failed to effectuate the transfer of Plaintiff's investment as promised.

68. Defendants further failed to advise Plaintiff of the International Fund's looming financial problems, and failed to advise him that he should redeem his investment in the International Fund on his own.

69. Defendants also failed to provide any evidence of the Domestic Fund's capacity limits to Plaintiff.

70. Any claim that Plaintiff's investment in the International Fund was illiquid is false. Based on its own financials, the International Fund had approximately $8.2 million in redemptions from investors in 2020. *See* **Exhibit M**.

71. Infinity eventually defaulted on the MLA and filed bankruptcy in the United States Bankruptcy Court in Nevada, Case No. 21-14486 on or about September 14, 2021. By that time, $14 million was due and owing to the International Fund under the MLA, and, as noted above, is almost certainly uncollectable.

72. Defendants, in furtherance of their efforts to conceal their conflicts of interest and other misconduct, have actively resisted complying with subpoenas in the bankruptcy matter.

73. No other agreement between Plaintiff and Defendants limited any fiduciary duties owed to Plaintiff.

74. After the International Fund's financial troubles became evident, Porter communicated to Plaintiff that he was waiving any fees associated for his "clients", which included Plaintiff. *See* **Exhibit N**.

75. Plaintiff and Porter had numerous conversations regarding financial issues, calculations, and next steps relative to the International Fund and Griffin. But Porter ultimately "disconnected [Plaintiffs] accounts from our management" and terminated the "advisory relationship" with Plaintiff on November 14, 2022. *See* **Exhibit O**.

**COUNT I: BREACH OF FIDUCIARY DUTY**

76. Plaintiff re-alleges and incorporates by reference all paragraphs above.

77. Defendants are "investment advisers" under California law and therefore owe a fiduciary duty to clients and prospective clients, including a fiduciary duty of loyalty and good faith.

78. The investment advisor/client relationship gives rise to a fiduciary duty, and Defendants knowingly undertook actions to act on behalf and for the benefit of Plaintiff as his investment advisor.

79. Defendants provided Plaintiff investment advice based on the advisor/client relationship.

80. Defendants nevertheless breached these duties, including without limitation failing to conduct the required due diligence on the International Fund, and/or failing to

warn Plaintiff of the International Fund's looming financial troubles, and/or failing to transfer Plaintiffs' funds as promised, and/or failing to disclose Defendants conflicts of interests with the International Fund, and/or failing to ascertain Plaintiff's risk threshold prior to recommending an investment, and/or failing to disclose Mr. Griffin's threats of loss of investment against Defendants, and/or failing to render disinterested advice based on Defendants relationships/investments with GAM, the Domestic Fund, or the International Fund.

81. Defendants fiduciary duties to Plaintiff are not affected by any agreement between Plaintiff and any other Defendant.

82. Plaintiff was damaged as a result of Defendants' conduct, including without limitation the loss of the $200,000.00 investment in the International Fund and the loss of potential gains in the Domestic Fund.

## PRAYER FOR RELIEF

Plaintiff seeks relief against Defendants as follows:

A. General, special, actual, consequential, and other appropriate damages caused by Defendants' conduct.

B. Plaintiff's taxable costs and reasonable attorney's fees to the extent permitted by law.

C. Pre- and post-judgment interest under California Civil Code § 3287 and California Code of Civil Procedure § 685.010.

D. For any other such relief as this Court deems fair and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues.

RESPECTFULLY SUBMITTED this 2nd day of November, 2023.



By: */s/ William M. Fischbach*
William M. Fischbach
(admitted *Pro Hac Vice*)
Elliot C. Stratton
(admitted *Pro Hac Vice*)
Seventh Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, Arizona 85016
**Attorneys for Plaintiff**

**TB TIFFANY & BOSCO**
P.A.

By: */s/ Chad L. Butler*
Chad L. Butler
1455 Frazee Road, Suite 820
San Diego, California 92108
**Attorneys for Plaintiff**

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Mark V. Boennighausen
Dinah X. Ortiz
**HOPKINS & CARLEY**
P.O. Box 1469
San Jose, CA 95109-1469
E:  mboennighausen@hopkinscarley.com
E:  dortiz@hopkinscarley.com
**Attorneys for Defendants**

By:   */s/ Kim Lehman*