# EXHIBIT 2

**Confidential Private Placement Memorandum**

# HASelect-FTM Medical Receivables Litigation Finance Fund SP

a segregated portfolio of
**HedgeACT International SPC Ltd.**
an exempted company incorporated with limited liability under the laws
of the Caymans Islands with registration number HS-334668

November 2019

For the exclusive use of: _____          Memorandum ID#_____

# HASelect-FTM Medical Receivables Litigation Finance Fund SP

a segregated portfolio of
## HedgeACT International SPC Ltd.
an exempted company incorporated with limited liability under the laws
of the Caymans Islands with registration number HS-334668

### TERMINOLOGY

---

**1933 Act** .................................. The Securities Act of 1933, as amended.

**1940 Act** .................................. The Investment Company Act of 1940, as amended.

**Administrator** .......................... NAV Consulting, Inc., providing the services of fund administrator and transfer agent, and a reference to the Administrator in this Memorandum will be deemed to be a reference to the Administrator either in its capacity as fund administrator or transfer agent, as the context requires.

**Advisers Act** ........................... The Investment Advisers Act of 1940, as amended.

**Allocation Shares** ................. Shares that may be designated as such by the Directors and issued to GAM to compensate GAM for its services to the Fund in the form of an Incentive Allocation.

**Articles** .................................... The memorandum and articles of association of the Company, as amended from time to time.

**Auditors** ................................... Marcum LLP.

**Business Day** .......................... A day (other than a Saturday or a Sunday) on which banks in Chicago, Illinois are authorized to open for normal banking business and/or such other day or days as GCM may determine, either generally or in any particular case.

**CIMA** ........................................ The Cayman Islands Monetary Authority.

**Class** ........................................ Any class of Shares designated by the Directors under the Articles.

**Code** ........................................ The Internal Revenue Code of 1986, as amended.

**Companies Law** .................... The Companies Law of the Cayman Islands, as revised, amended or re-enacted from time to time.

**Company** ................................ HedgeACT International SPC Ltd., an exempted company incorporated with limited liability under the laws of the Caymans Islands with registration number HS-334668.

**Delaware Act** ......................... The Delaware Limited Liability Company Act.

**Directors** ................................. The directors of the Company from time to time.

**ERISA** ....................................... The Employee Retirement Income Security Act of 1974, as amended.

**FTM** .......................................... FTM Limited, a company organized under the Vanuatu Company's Act, which acts as an investment subadviser to GCM respecting the Fund's assets.

**FTM Fund** ................................ FTM Limited, an investment company incorporated in Vanuatu as a Public Company under the laws of the Republic of Vanuatu. The FTM Fund is sponsored by FTM and is not otherwise connected with this offering or the Fund. *No investment in the FTM Fund is solicited under this Memorandum.*

**The "Fund," "we" or "us"** ...... HASelect-FTM Medical Receivables Litigation Finance Fund SP, a segregated portfolio of the Company.

**HedgeACT** .............................. HedgeACT Select LLC, a Delaware series limited liability company.

**Investment Manager or "GAM"** ................................... Griffin Asset Management LLC, an Illinois limited liability company and affiliate of GCM.

**Lockup Period** ....................... With respect to any Shares purchased, twelve months from the date of purchase.

**"GCM"** .................................... Griffin Capital Mgt LLC, a Delaware limited liability company and affiliate of GAM. GCM is the sole holder of the Management Shares.

**Incentive Fee** ......................... The profit allocation payable to GAM under the IMA respecting the Fund's realized and unrealized gains.

**Investment Management Agreement, or "IMA"** ............ The Investment Management Agreement between the Fund and GAM.

**Management Share** ............. A non-participating, non-redeemable, voting share of par value $0.01 in the capital of the Company designated as a Management Share.

**Mutual Funds Law** .................. The Mutual Funds Law of the Cayman Islands, as revised, amended or re-enacted from time to time.

**Portfolio** .................................. Each segregated portfolio of the Company, including the Fund.

**Primary Borrower** .................. The U.S.-based corporation to which the Fund loans capital under the Primary Loan Agreement.

**Primary Loan** ......................... The revolving loan the Fund makes to Primary Borrower under the Primary Loan Agreement.

**Primary Loan Agreement** ..... A loan agreement between the Fund and Primary Borrower under which the Fund loans capital from time to time.

**Redemption Date** ................. The last Business Day of each quarter (and/or at such other times the consent of, and upon such terms of payment as may be approved by GCM in its discretion), on which redemptions of Shares are effected.

**Reg S** ....................................... Regulation S adopted by the SEC under the 1933 Act.

**SEC** .......................................... The Securities and Exchange Commission.

**Share** ....................................... A participating, redeemable, non-voting share of par value $0.01 in the capital of the Company attributable to the Fund and being offered for subscription under the terms of this Memorandum.

**Shareholder** ............................ A holder of one or more Shares.

**Sub-Advisory Agreement** ..... That Sub-Advisory Agreement between the Fund, GCM and FTM under which FTM serves as GCM's subadviser.

**Subscription Date** ................. The first Business Day of each month and / or such other day or days as GCM may determine, either generally or in any particular case.

**US Person** ............................... A citizen or resident of the United States, a corporation, partnership or other entity created or organized in or under the laws of the United States or any person falling within the definition of the term "United States Person" under Reg S.

**Valuation Day** ........................ For each Class, the Business Day immediately preceding each Redemption Date and each Subscription Date and / or such other day or days as GCM may determine, either generally or in any particular case.

## NOTICES

The Company is an exempted company incorporated with limited liability and registered as a segregated portfolio company under the Companies Law. This Memorandum relates to the offering of Shares attributable to the Fund, a segregated portfolio of the Company.

*Responsibility statement:* The Directors, whose names appear in the Directory, accept responsibility for the information contained in this Confidential Private Placement Memorandum, as it may be amended or supplemented from time to time ("**Memorandum**"). To the best of the knowledge and belief of the Directors who have taken reasonable care to ensure that the information contained in this Memorandum is in accordance with the facts, and contains such information as is necessary to enable a prospective investor to make an informed decision as to whether or not to subscribe for the Shares.

*Reliance on this Memorandum:* The Shares are offered only on the basis of the information contained in this Memorandum. Any further information or representations given or made by any dealer, broker or other person should be disregarded and accordingly, should not be relied upon. No person has been authorized to give any information or to make any representations in connection with the offering of the Shares other than those contained in this Memorandum and, if given or made, such information or representations must not be relied on as having been authorized by the Directors.

Statements in this Memorandum are based on the law and practice in force in the Cayman Islands at the date of this Memorandum and are therefore subject to change should that law or practice change. Neither the delivery of this Memorandum nor the issue of the Shares shall under any circumstances create any implication or constitute any representation that the affairs of the Company have not changed since the date of this Memorandum.

*Regulation:* The Company is a "regulated mutual fund" for the purposes of the Mutual Funds Law and is registered with CIMA under Mutual Funds Law §4(3). This Memorandum has been filed with CIMA. Such registration does not imply that CIMA or any other regulatory authority in the Cayman Islands has approved this Memorandum or the offering of the Shares.

THIS MEMORANDUM IS PROVIDED ON A CONFIDENTIAL BASIS SOLELY FOR THE INFORMATION OF THOSE PERSONS TO WHOM IT IS TRANSMITTED BY THE UNDERSIGNED SO THAT THEY MAY CONSIDER THE FUND'S OFFERING AND IS NOT TO BE REPRODUCED OR USED FOR ANY OTHER PURPOSE.  PROSPECTIVE INVESTORS IN SHARES ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL ADVICE.  EACH PROSPECTIVE INVESTOR SHOULD CONSULT THE INVESTOR'S OWN ADVISERS CONCERNING LEGAL, TAX, ERISA AND RELATED MATTERS CONCERNING AN INVESTMENT IN THE SHARES.

**THE OFFER AND SALE OF SHARES HEREBY HAS NOT BEEN REGISTERED WITH THE SEC OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE 1933 ACT, AND, ACCORDINGLY, MAY NOT BE OFFERED OR RESOLD EXCEPT UNDER AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT OR UNDER AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS.**

**THE SHARES ARE BEING OFFERED IN RELIANCE ON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND ARE NOT REQUIRED TO COMPLY WITH SPECIFIC DISCLOSURE REQUIREMENTS THAT APPLY TO REGISTRATION UNDER THE 1933 ACT.  SIMILARLY, THE SHARES ARE NOT SUBJECT TO THE PROTECTIONS PROVIDED BY THE 1940 ACT.  THE SEC HAS NOT PASSED UPON THE MERITS OF OR GIVEN ITS APPROVAL TO THE SHARES, THE TERMS OF THE OFFERING, OR THE ACCURACY OR COMPLETENESS OF THIS MEMORANDUM.  THE SHARES MAY BE SOLD ONLY TO "ACCREDITED INVESTORS" WHO MEET MINIMUM NET WORTH THRESHOLDS AND TO "QUALIFIED CLIENTS." SHARES MAY BE SEPARATELY SOLD TO PERSONS OUTSIDE OF THE UNITED STATES UNDER REGULATION S ADOPTED UNDER THE 1933 ACT ("REG S").  SHARES SO SOLD MAY NOT BE RESOLD IN THE U.S. AND ARE SUBJECT TO OTHER REG S LIMITATIONS.**

**THE SHARES ARE SUBJECT TO LEGAL RESTRICTIONS ON THE TRANSFER AND RESALE AND INVESTORS SHOULD NOT ASSUME THEY WILL BE ABLE TO RESELL THE SHARES.  INVESTING IN THE SHARES INVOLVES RISK, AND INVESTORS SHOULD BE ABLE TO BEAR THE LOSS OF THEIR INVESTMENT IN THE SHARES.  *SEE "RISK FACTORS" BELOW.***

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THE OFFERING.  THE SHARES HAVE NOT BEEN RECOMMENDED BY ANY STATE SECURITIES AUTHORITY, NOR HAVE THE FOREGOING AUTHORITIES CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SHARES WILL BE OFFERED AND SOLD FOR INVESTMENT ONLY TO QUALIFYING RECIPIENTS UNDER EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT INCLUDING SECTION 4(a)(2) THEREOF AND THE RULES ADOPTED THEREUNDER BY THE SEC AND IN COMPLIANCE WITH ANY APPLICABLE STATE OR OTHER SECURITIES LAWS, INCLUDING, AS APPLICABLE, THOSE RESTRICTIONS IDENTIFIED IN <u>EXHIBIT A</u>.  THE TRANSFERABILITY OF THE SHARES WILL BE RESTRICTED BY THE TERMS OF THE ARTICLES.  THE FUND WILL CONTINUE TO CONDUCT ITS ACTIVITIES SO THAT IT IS NOT REQUIRED TO REGISTER AS AN INVESTMENT COMPANY UNDER THE 1940 ACT, THOUGH THE FUND CAN PROVIDE ASSURANCE THAT IT WILL MAINTAIN AN EXEMPTION FROM SUCH REQUIREMENT. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL, OR THE SOLICITATION OF AN OFFER TO BUY, ANY SHARES IN ANY STATE OR OTHER JURISDICTION WHERE, OR TO OR FROM ANY PERSON TO OR FROM WHOM, SUCH OFFER OR SOLICITATION IS UNLAWFUL OR NOT AUTHORIZED.

INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF AN INVESTMENT IN THE SHARES FOR AN EXTENDED PERIOD OF TIME.  SHARES ARE SUITABLE ONLY FOR PERSONS OF SUBSTANTIAL FINANCIAL MEANS WHO CAN BEAR THE RISK OF LOSS IN THEIR ENTIRE INVESTMENT IN THE SHARES, AND HAVE NO NEED FOR IMMEDIATE LIQUIDITY IN THEIR INVESTMENT.  ACCORDINGLY, THE SHARES WILL BE SOLD ONLY TO INVESTORS WHO MEET CERTAIN FINANCIAL CRITERIA AND SUITABILITY REQUIREMENTS SO AS TO QUALIFY THEM AS "ACCREDITED INVESTORS" AS DEFINED IN REGULATION D ADOPTED UNDER THE 1933 ACT AND AS "QUALIFIED CLIENTS" AS DEFINED IN ADVISERS ACT RULE 205-3.  GCM RESERVES THE RIGHT TO REJECT ANY POTENTIAL INVESTOR FOR ANY REASON.

THIS MEMORANDUM IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ARTICLES AND THE SUBSCRIPTION AGREEMENT RELATED THERETO.  STATEMENTS IN THIS MEMORANDUM ARE MADE AS OF THE DATE HEREOF UNLESS STATED OTHERWISE HEREIN, AND NEITHER THE DELIVERY OF THIS MEMORANDUM AT ANY TIME, NOR ANY SALE HEREUNDER, SHALL UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO SUCH DATE.  GCM RESERVES THE RIGHT TO MODIFY ANY OF THE TERMS OF THE OFFERING AND THE SHARES DESCRIBED HEREIN AS PERMITTED BY THE ARTICLES.

PROSPECTIVE INVESTORS SHOULD INFORM THEMSELVES AS TO THE LEGAL REQUIREMENTS AND TAX CONSEQUENCES WITHIN THE COUNTRIES OF THEIR CITIZENSHIP, RESIDENCE, DOMICILE AND PLACE OF BUSINESS WITH RESPECT TO THE ACQUISITION, HOLDING OR DISPOSAL OF SHARES.  AN INVESTOR, SUCH AS AN INDIVIDUAL RETIREMENT ACCOUNT ("**IRA**") OR A PENSION OR PROFIT-SHARING PLAN WHICH IS SUBJECT TO ERISA OR WHICH IS AN ENTITY EXEMPT FROM TAXATION UNDER CODE §501, SHOULD CONSULT WITH ITS LEGAL, FINANCIAL AND TAX ADVISORS BEFORE INVESTING IN THE SHARES.  *SEE "REGULATORY CONSIDERATIONS."*  SUCH INVESTORS MAY BECOME SUBJECT TO FEDERAL INCOME TAXATION IF WE USE BORROWED FUNDS IN OUR INVESTMENT ACTIVITIES. *SEE "TAXATION."*

A PROSPECTIVE INVESTOR SHOULD NOT SUBSCRIBE FOR SHARES UNLESS SATISFIED THAT HE AND/OR HIS REPRESENTATIVES HAVE ASKED FOR AND RECEIVED ALL INFORMATION WHICH WOULD ENABLE THEM TO EVALUATE THE MERITS AND RISKS OF THE PROPOSED INVESTMENT IN THE FUND.  GCM WILL MAKE AVAILABLE TO EACH INVESTOR AND HIS REPRESENTATIVE(S) THE OPPORTUNITY TO OBTAIN ANY ADDITIONAL INFORMATION CONCERNING ANY ASPECT OF THE FUND AND ITS BUSINESSES TO THE EXTENT GCM POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

PROSPECTIVE INVESTORS HAVING INQUIRIES WITH RESPECT TO THE FUND OR THE SHARES MAY DIRECT SUCH INQUIRIES TO MICHAEL E. GRIFFIN, (312) 952-0685.

<u>FOR FLORIDA INVESTORS</u>:  IF SALES OF SHARES ARE CONSUMMATED WITH FIVE OR MORE PERSONS IN THE STATE OF FLORIDA, ANY SUCH PERSON MAY, AT SUCH PERSON'S OPTION, VOID ANY PURCHASE HEREUNDER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE PERSON TO THE FUND, AN AGENT OF THE FUND, OR AN ESCROW AGENT OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE PERSON, WHICHEVER OCCURS LATER.

### NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain statements contained in this Memorandum, including statements containing the words "anticipate," "expect," "believe," "should," "would," "could," "estimate," "project," "foresee," "expect," "intend," "may," "objective," "plan," "priority," continue," "will," or a variation of one of these words or words or phrases of similar import, constitute "forward-looking statements." Such forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. Certain of these factors are discussed in more detail elsewhere in this Memorandum, including under *Summary of Terms," "Risk Factors," and "Important Considerations."* Given these uncertainties, Investors are cautioned not to place undue reliance on such forward-looking statements. We disclaim any obligation to update any such factors or to announce the result of any revisions to any of the forward-looking statements contained herein to reflect future events or developments.

In addition, all materials or documents we supply, including any anticipated tax consequences of an investment in the Shares, should be considered speculative and are qualified in their entirety by the assumptions, information and risks disclosed in this Memorandum. The projections are based on assumptions made by the Directors regarding future events. There is no assurance that actual events will correspond with these assumptions. Actual results for any period may or may not approximate projections and may differ significantly. Investors should consult with their tax and business advisors about the validity and reasonableness of any factual, accounting and tax assumptions. Due to the significant uncertainties inherent in any prediction of future events, the inclusion of such forward-looking statements should be regarded as illustrations only and should not be treated as a representation made by us as to the certainty of future results and not relied upon in making an investment decision concerning this Memorandum.

Neither the Directors, GCM nor any other person or entity makes any representation or warranty as to the Fund's future profitability or of an investment in the Shares. In considering the prior performance information contained herein, prospective investors should bear in mind that past performance is not necessarily indicative of future results, and there can be no assurance that we will achieve comparable results. This Memorandum is part of a continuous offering process. Periodically, we may, but are under no obligation to, amend this Memorandum, which may add, update or change information contained in this Memorandum. Any statements that we make in this Memorandum, as supplemented or amended, will be modified or superseded by any inconsistent or updated statement made by us in a subsequent supplement or amendment to the Memorandum.

**This Memorandum is confidential and proprietary to the Company. It is provided to the recipient in confidence with the understanding that the recipient will observe and comply with the terms and conditions in this paragraph and the paragraphs above. The recipient's acceptance and retention of this Memorandum constitutes an agreement to be bound by such terms and conditions. If any of such terms are not acceptable, this Memorandum should be promptly returned to:**

**Griffin Capital Mgt. LLC**
**403 South La Grange Road, La Grange, Illinois 60525**
**Attention: Michael E. Griffin**
**(312) 952-0685 | mike@hedgeact.com**

## TABLE OF CONTENTS

General Overview ........................................................................................................... 1

Summary of Terms ........................................................................................................ 3

Investment Strategies ................................................................................................... 10

The Company & the Fund ............................................................................................. 11

Service Providers .......................................................................................................... 12

Management & Administration .................................................................................... 14

Fees & Expenses ........................................................................................................... 15

Risk Factors .................................................................................................................. 16

Redemptions ................................................................................................................. 22

Net Asset Value ............................................................................................................ 24

Summary of the Articles ............................................................................................... 26

Taxation ........................................................................................................................ 29

Regulatory Considerations ........................................................................................... 35

Plan of Distribution ...................................................................................................... 37

Country-Specific Notices ................................................................................. Exhibit A

Subscription Booklet ........................................................................................ Exhibit B

## DIRECTORY

**Registered Office:**
4th Floor, Harbour Place | 103 South Church Street
PO Box 10240
Grand Cayman | Cayman Islands | KY1-1002
+1 345 949 8599 | cayman@harneys.com

**Directors:**

| Michael Griffin | Simon Clark |
|---|---|
| 403 South La Grange Road, La Grange, Illinois 60525 | 1105 Las Alturas Road Santa Barbara, CA 93103 |

**GCM:**
Griffin Capital Mgt. LLC
403 South La Grange Road
La Grange, Illinois 60525
Attention: Michael E. Griffin
(312) 952-0685 | mike@hedgeact.com

**Investment Manager:**
Griffin Asset Management LLC
403 South La Grange Road
La Grange, Illinois 60525
Attention: Michael E. Griffin
(312) 952-0685 | mike@hedgeact.com

**Administrator & Transfer Agent:**

NAV Fund Services (Cayman) Ltd.
Transfer Agency Services
5th Floor Harbour Place | 103 South Church Street
George Town | Grand Cayman
Cayman Islands | KY1-1202
(345) 946-5006 | navconsulting.net

**Subadviser:**



FTM Limited
Tana Russet Plaza, First Floor SuiteT-19
Kumul Highway, PO Box 1692 | Port Vila, Efate 0000
Vanuatu, South Pacific
+ 678 238 39 | info@FTM-Investments.com

**Net Asset Calculation Agent:**

NAV Consulting, Inc.
1 Trans Am Plaza Drive, Suite 400
Oakbrook Terrace, Illinois 60181
(630) 954-1919 | navconsulting.net

**Auditor:**

Marcum LLP
Cayman Corporate Centre | 27 Hospital Road
PO Box 1748 | George Town | Grand Cayman
Cayman Islands, B.W.I.
800-390-2060 | marcumllp.com

**Legal Adviser as to U.S. Law:**

Polsinelli PC
100 South 4th Street, Suite 1000
St. Louis, Missouri 63102
314-889-8000 | polsinelli.com

**Legal Adviser as to Cayman Islands Law:**

Harney Westwood & Riegels
4th Floor, Harbour Place | 103 South Church Street
PO Box 10240
Grand Cayman | Cayman Islands | KY1-1002
+1 345 949 8599 | cayman@harneys.com

## GENERAL OVERVIEW

### FUND FOCUS

We will lend substantially all of our capital raised by the sale of Shares, net of offering and operational expenses, to borrowers such as the Primary Borrower.

### MEDICAL RECEIVABLES STRATEGY

*Generally.* Our borrowers will have relationships with medical service providers and others to purchase medical receivables and other types of assets or individual loans. Receivables our borrowers acquire may be for a variety of healthcare services.

Our borrowers typically seek to acquire receivables or other assets at a discount to their face value and retain the spread between the face amount of the receivable / asset and the amount it acquired the asset with the Fund's capital, net of interest owed to the Fund.

The capital we lend to borrowers is typically secured by a promissory note in favor of the Fund made by the borrower, as well as an assignment of the borrower's interests in liens or other assets and a grant of a security interest in certain of the borrower's assets.

*Primary Borrower Strategies.* At the direction of GCM and FTM, Primary Borrower will use its network of hospitals, attorneys, medical service providers and medical resonance imaging ("**MRI**") centers and negotiate favorable rates for the purchase of medical receivables in connection with personal injury cases in the U.S.

The Primary Borrower will conduct due diligence and if its criteria are met, will then purchase receivables while normally taking a lien (the "**Primary Borrower Lien**") from the plaintiff against any settlement the plaintiff receives in his / her personal injury case. These Primary Borrower Liens typically are also executed by the plaintiff's attorney under which both the plaintiff and his / her lawyer agree to repay the full amount of the service provider's fees to Primary Borrower before disbursing other settlement proceeds to the plaintiff or his / her counsel. The Primary Borrower may also acquire receivables without a lien in some cases.

The types of receivables we anticipate Primary Borrower acquiring will be for surgeries, MRIs, pain management and for the purchase of pharmaceuticals on a lien.

Primary Borrower seeks to acquire these receivables at a discount to their face value and to the extent a plaintiff's case settles and Primary Borrower is repaid the full amount subject to the Lien, Primary Borrower will retain the spread between the face amount of

the receivable repaid and the discounted amount it acquired the receivable with the Fund's capital, net of interest owed to the Fund under the Primary Loan Agreement. Upon repayment of the receivable by the plaintiff, the Primary Loan Agreement requires Primary Borrower to promptly repay the principal amount borrowed by Primary Borrower plus interest.

Under the Primary Loan Agreement, our capital loaned to Primary Borrower is secured by a promissory note in favor of the Fund made by Primary Borrower (the "**Primary Borrower Note**"), as well as a blanket assignment to the Fund of any Primary Borrower Liens (the "**Primary Borrower Blanket Lien**"), and a grant of a security interest in certain of Primary Borrower's assets. Our capital and Primary Borrower's obligations under the Primary Loan Agreement will not be secured in any further manner, such as by personal or other guarantees. As described below, the Primary Borrower may have other similar debt.

*Fund Goals.* We do not plan to leverage, or borrow, additional capital from outside sources to fund our lending program, though the Directors reserve the right to do so in the future.

Our lending arrangements will be completely uncorrelated to broader markets. Receivables acquisitions like those made by Primary Borrower will be underscored by underwriting procedures developed by FTM and Primary Borrower, which are highly selective and use a robust review process.

The Fund is expected to have a low beta to reinforce a low negative volatility and lack of correlation to the broader market.

The receivables funded by the Fund are expected to primarily have a shorter average duration (12-30 months) than traditional litigation finance (3-5 years), with multiple sources of receivable types, though we may lend to other borrowers that specialize in longer-duration financings. Further, many receivables are expected to be fairly small, which can lead to reduced settlement times in some sectors.

Our goal is to exceed the past returns achieved by a separate fund managed by FTM (the FTM Fund), based on expanded sourcing, wider opportunity spread and increased capital availability. Additionally, the historical performance of the FTM Fund so far has enjoyed favorable collection history with defaults averaging 1.2%. However, there are important differences between our structure and that of any other vehicle managed by FTM, including that our sole source of gains will be the interest paid by borrowers—we will not participate in the gains our borrowers may realize through the discounted

amounts they pay for receivables and other assets. *See "Risk Factors" below.*

The foregoing summary of our investment strategies represent GCM's current intentions, are general in nature and are not exhaustive. There are no limits on the types of receivables that we may agree to fund, the concentration of receivable types we may fund or the amount of leverage that we may use.

Depending on conditions and trends in markets and the economy generally, we may pursue other objectives or use any techniques that GCM considers appropriate and in the Fund's interest.

There can be no assurance that we will achieve our investment objective or that we will not experience losses.

## SUMMARY OF TERMS

*The following is a summary of the terms the Offering and of the Fund, and is qualified in its entirety by the more detailed information provided in this Memorandum and by the terms and conditions of the Articles and the subscription documents for the Fund (as the same may be amended from time to time, the "**Subscription Documents**") related to the Offering, some of which could change and each of which should be read carefully by any prospective investor before investing. Capitalized terms used below and not otherwise defined will have the same meaning provided in the Articles.  If any disclosure below is inconsistent with any provision of the Articles or Subscription Documents, the provision of the Articles or Subscription Documents, as the case may be, will control.*

**The Fund & the Company** ... HASelect-FTM Medical Receivables Litigation Finance Fund SP is a segregated portfolio of HedgeACT International SPC Ltd., an exempted company incorporated with limited liability under the laws of the Caymans Islands with registration number HS-334668.

A segregated portfolio company is permitted to create one or more segregated portfolios in order to segregate the assets and liabilities of the company held in respect of one segregated portfolio from the assets and liabilities of the company held in respect of any other segregated portfolio and/or the general assets and liabilities of the company. Under Cayman Islands law, the assets of one segregated portfolio will not be available to meet the liabilities of another segregated portfolio. Notwithstanding the segregation of assets and liabilities between segregated portfolios, a segregated portfolio company is a single legal entity and no segregated portfolio constitutes a legal entity separate from the company itself.

This Memorandum relates only to HASelect-FTM Medical Receivables Litigation Finance Fund SP, a segregated portfolio of the Company. The Directors may at any time create additional segregated portfolios without notice to, or the consent of, the Shareholders. Each segregated portfolio may have, and is expected to have, different investment strategies from those of other segregated portfolios of the Company. The Company may issue participating shares of one or more classes in respect of a segregated portfolio.

*See "The Company & the Fund."*

**The Shares**............................ The Directors have initially created and designated one Class in respect of the Fund, being Class A Shares attributable to the Fund, which are being offered under the terms of this Memorandum. At any time the Directors may establish and designate additional Classes without notice to, or the consent of, the Shareholders. The Directors may differentiate between Classes on various bases, including the fees payable, the level of information provided and redemption rights.  *See "Summary of the Articles."*

**Fund & Company Management** ...................... The Directors have overall responsibility for the management and administration of the Company. However, the Directors have delegated responsibility for day-to-day administrative functions to the Administrator and responsibility for making day-to-day decisions to GCM.

We have entered into the IMA with GAM under which GAM will provide us with certain services.  *See "Service Providers."*

**Receivables Financing Strategy**................................. Our investment objective is to achieve favorable returns by lending money on a rolling basis to borrowers such as Primary Borrower.  Primary Borrower will, at the direction of FTM, primarily acquire discounted receivables secured by Liens obligating plaintiffs to repay the full amount if and when their personal injury case settles.  Other borrowers may acquire other types of receivables or sub-lend to other parties.

While our borrowers will earn profits from the spread between the discounted amount they negotiate with sellers of receivables or other assets, our only income arising from our lending activity will be interest paid by borrowers, which for example accrue at 19% under the Primary Loan Agreement (and in some cases

more), with interest of 6% due upon repayment of any advance.  There can be no assurance that borrowers will perform under their loan agreements with us or that we will not lose investor capital.  *See "Investment Strategies."*

**HedgeACT Management ...**  Griffin Capital Mgt LLC, a Delaware limited liability company, is HedgeACT's Managing Member, and has discretion over the management and administration of its affairs.  As the managing member and controlling person of GCM and GAM, Michael E. Griffin (the "**Principal**") controls all of HedgeACT's operations and activities.   GAM is not currently registered with any state and/or federal government as an investment adviser.  GCM and GAM have common ownership.  *See "Service Providers."*

**Minimum Investment..........**  The minimum initial investment in the Shares is **$250,000**, and the minimum subsequent investment is **$50,000**.  GCM may waive or reduce the minimum initial investment either generally or in any particular case. However, for so long as the Company is registered under Mutual Funds Law §4(3), the minimum initial investment cannot be less than **$100,000**.  *See "Plan of Distribution."*

**Investor Qualification ..........**  Currently, Shares are only available to persons in the U.S. who are "accredited investors" under Reg D, who are persons to whom the Fund can lawfully make an invitation to subscribe for Shares without compliance with any registration or other legal requirements, who are able to acquire and hold Shares without breaching the law or requirements of any government authority and who satisfy such additional eligibility requirements as may be determined by GCM from time to time ("**Eligible Investors**").

Depending on the nationality of the investor, investors may be required to meet additional qualifications, as summarized in <u>Exhibit A</u> and as further provided in the Subscription Agreement.  GCM reserves the right to alter investor qualifications.  *See "Plan of Distribution."*

**Subscriptions ........................**  Shares are available for subscription on each Subscription Date at the Net Asset Value per Share of the Initial Series of the relevant Class as at the Valuation Day immediately preceding the Subscription Date on which the application is effective (the "**Subscription Price**"). If all Shares of the Initial Series are redeemed, the Directors may substitute another series as the Initial Series and may make such adjustments as they consider necessary to ensure that each series bears its proper proportion of the liabilities of the Fund.  *See "Plan of Distribution."*

**Commissions ........................**  To the extent reflected in a Shareholder's Subscription Agreement, the Directors may agree to cause the Portfolio to pay a portion of a Shareholder's gross subscription payment to the Fund to a qualified third party registered broker-dealer for its assistance in the sale of the Shares.  Such payments may be made under an agreement between GCM or the Fund and such broker-dealer, or they may be made under an agreement between the Shareholder and the broker-dealer.  In either case, the amount of the payment will be reflected in the Shareholder's Subscription Agreement and such commission payments will not count toward the Shareholder's purchase of Shares.

Depending on the arrangements with any such broker-dealers, commission payments may be an up-front reduction of a Shareholder's subscription payment to the Fund, or an ongoing payment funded by scheduled redemptions of Shares, or a combination of the foregoing.

*See "Plan of Distribution."*

**Valuations............................**  The Net Asset Value and the Net Asset Value per Share of each Class will be calculated as at the Valuation Point on each Valuation Day.  The Platform Fee and Management Fee described below will also be calculated on our NAV.

Our primary asset will be the revolving loans we make to borrowers, including the Primary Borrower.  Absent extraordinary circumstances, our loans will be valued at

cost (e.g., the amount of cash we loan) plus accrued interest.

The Directors may temporarily suspend the calculation of the Net Asset Value and/or the Net Asset Value per Share of any Class in certain circumstances. *See "Net Asset Value."*

**GAM Fees** ............................ For its services to the Fund, GAM will be paid a quarterly platform fee of 0.0125% (approximately 0.50% annually) of the Fund's NAV (the "**Platform Fee**"). The Platform Fee is in addition to any of our expenses.

For its investment management services to the Fund, we will pay GAM a management fee of 1.50% our NAV annually (the "**Management Fee**"). The Management Fee will be calculated and payable to GAM quarterly.

We will also pay GAM an incentive fee (the "**Incentive Fee**") on a quarterly basis equal to 5.0% (20% annually) of the excess of our net profits (including realized and unrealized gains and losses) over net losses, if any, for each quarter (the "**Net Profits**").

The Incentive Fee is subject to a "**High Water Mark**," which is the amount of the Fund's Net Profits immediately after the assessment of the most recent Incentive Fee. If the Fund has an aggregate net loss in any fiscal period, this loss will be recorded and carried forward to future fiscal periods (such amount is referred to as the "**Loss Carryforward**"). GAM will not receive the Incentive Fee in any future period until the Loss Carryforward amount has been recovered (*i.e.*, when the Loss Carryforward amount has been exceeded by the Net Profits for the period following the Loss Carryforward). Once the Loss Carryforward has been recovered, the Incentive Fee will be based on the Fund's Net Profits (over the Loss Carryforward amount).

**Sub-Advisory Agreement** ... GAM has caused the Fund to enter into the Sub-Advisory Agreement with FTM. Under the Sub-Advisory Agreement, GAM has engaged FTM to oversee the Primary Borrower's performance under the Primary Loan Agreement and provide numerous reporting functions. The Sub-Advisory Agreement may be terminated by either party upon 90 days' notice, or immediately for cause.

Under the Sub-Advisory Agreement, GAM will pay FTM ⅔ of the Management Fee payable to GAM, and will pay FTM ½ of the Incentive Fee payable to GAM. Further, the Fund will indemnify FTM for certain customary matters.

**Distributions** .......................... Net of our expenses, Management Fees, Incentive Fees, subadvisory fees and other expenses, the Fund does not intend to make distributions of its net income to Shareholders, and instead re-invest the same in the Fund's lending program.

**Organizational & Offering Expenses** .............................. We will pay or reimburse GCM, GAM and/or their respective affiliates for all of our organizational and offering expenses, including legal and accounting fees, printing and mailing expenses and government filing fees (including blue sky filing fees) to the extent not reimbursed by FTM. GAM's organizational expenses that the Fund will incur include up to $15,000 to compensate GAM for its efforts to establish the Fund.

Similarly, the Fund may pay GCM up to $15,000 to compensate it for its efforts to wind up the Fund's affairs.

Each of the Company's Portfolios—including the Fund—will bear its *pro rata* share of the Company's expenses that are attributable to the Portfolio. Costs and expenses attributable to a particular Portfolio will be borne solely by that Portfolio. Our organizational expenses may be, for accounting purposes, capitalized and amortized by the Fund for up to 60 months from our commencement of operations. Amortization of such expenses is a divergence from GAAP. In certain circumstances, this divergence may result in a qualification of our annual audited financial statements. In such instances, we may elect to (i) avoid the qualification

by recognizing the unamortized expenses or (ii) make GAAP conforming changes for financial reporting purposes, but amortize expenses for purposes of calculating our NAV (resulting in a divergence in fiscal year-end NAVs reported in the Company's (and the Fund's) financial statements. If the Company or the Fund is terminated within 60 months of its commencement, any unamortized expenses will be recognized. If a Shareholder makes a withdrawal prior to the end of the period during which we are amortizing expenses, we may, but are not required to, accelerate a proportionate share of the unamortized expenses based upon the amount being withdrawn and reduce withdrawal proceeds accordingly.

*See "Summary of the Articles."*

**Operating Expenses** ............ The Fund will be responsible for all ongoing costs and expenses associated with its administration and operations. The Fund's costs and expenses will generally consist of the following:

● its Platform Fee, Management Fee and Incentive Fees;

● administrative, accounting, auditing and tax services, preparation and related fees, governmental fees and taxes, withholding and transfer fees, administrator fees, costs of communications with Shareholders and settlement charges;

● ongoing legal, accounting, auditing, bookkeeping, consulting and other professional fees;

● all expenses incurred in connection with the ongoing offer and sale of Shares, including printing, marketing expenses and documentation of performance and the admission of Shareholders;

● fees incurred in connection with the investigation, prosecution or defense of any claims, assertion of rights or pursuit of remedies, by or against the Fund, including professional and other advisory and consulting expenses and travel expenses; and

● any other fees that may arise in the ordinary course of business that are not related to GCM's or GAM's salary or rent.

*See "Summary of the Articles."*

**GCM & GAM Expenses** ....... GCM and GAM will pay for their own general operating and overhead expenses associated with providing the management and investment management services required under the Articles and the IMA, respectively. These expenses include all expenses incurred by the parties in providing for their normal operating overhead, but not including any operating expenses of the Fund or of the Company described above. *See "Summary of the Articles."*

**Redemptions** ....................... *Shareholder Redemptions.* Shareholders may only request to redeem Shares after twelve months from their original investment (the "**Lockup Period**"). Following the Lockup Period, the minimum redemption amount is **$100,000**. Redemptions may occur as of the Redemption Date—the last Business Day of each quarter (and/or at such other times and in such other amounts with the consent of, and upon such terms of payment as may be approved by GCM in its discretion), upon at least 105 days' prior written notice to the Administrator (the "**Redemption Notice**").

Unless the Directors consent, partial redemptions may not be made if they would reduce a Shareholder's Share valuation (at current NAV) below $100,000 (the "**Minimum Holding**"). All redemptions will be deemed made prior to the commencement of the following quarter.

*Early Redemption Fee.* GCM may, in its discretion, impose an early redemption fee of up to 5% of the amount to be redeemed for any redemption requested prior to the end of the Lockup Period.

*Payments.* Subject to the Redemption Gate described below and any defaults by any borrower, a Shareholder who requests a redemption of Shares that constitutes,

together with prior redemptions within any fiscal year, less than 90% of the value of such Shareholder's Shares (at current NAV) will be paid within 45 days after the applicable Redemption Date.  A Shareholder who is redeeming 90% or more of the value of such Shareholder's Shares in the aggregate (at current NAV) within any fiscal year will be paid 90% of an amount estimated by the Directors to be the amount to which the redeeming Shareholder is entitled (calculated on the basis of unaudited data) within 45 days after the applicable Redemption Date.  The balance of the amount payable upon such redemption (if any, and after audit adjustment for the year) will be paid, without interest, within 30 days after issuance of the December 31 audited financial statements for the fiscal year during which the redemption occurred.  Upon redemption of all of a Shareholder's Shares, the Shareholder will be deemed to have withdrawn from the Fund and from the Company, and upon notice of such redemption, a Shareholder will not be entitled to exercise any voting or like rights afforded to Shareholders under the Articles.

If redemptions are restricted because of a default by a borrower, the Directors will ratably reduce all redemption requests the subject to Redemption Notices, and carry forward the same until the default is cured.

*Reserves.* The Directors may cause the Fund to establish such reserves as it deems necessary for contingent Fund or the Fund's share of the Company's liabilities, including estimated expenses in connection therewith, which could reduce the amount of a distribution upon withdrawal.

*Waiver.* The Directors, in their discretion, may waive or modify any of the terms relating to redemptions, including minimum amounts for all or any of the Shareholders in its sole discretion, without notice to the other Shareholders.

*Redemption Gate.*   If Shareholders seek to redeem Shares representing in aggregate 25% or more (or such higher percentage as the Directors determine, either generally or in respect of any particular Redemption Date) of the Net Asset Value of the Fund (the "**Redemption Gate**), the Directors may ratably reduce all redemption requests to 25% of the number of Shares then subject to Redemption Notices.

*See "Summary of the Articles" and "Redemptions."*

| | |
|---|---|
| **Required Redemptions .......** | The Directors may require a Shareholder to redeem all or any amount of his / her Shares if they consider such withdrawal to be in the best interest of the Fund or for any other reason or no reason at all.  In such event, GCM will give at least five days' written notice to the Shareholder specifying the date of redemption.   As soon as practicable thereafter, the redeeming Shareholder will receive payment as described above under "Redemptions—Payment." *See "Redemptions."* |
| **Leverage.............................** | The Fund does not currently intend to borrow money to increase amounts loaned to any borrower or for other investment purposes, though the Directors reserve the right to cause the Fund to borrow funds in the future. |
| **Regulation ...........................** | The Company is registered with CIMA as a regulated mutual fund under Mutual Funds Law §4(3). Accordingly, the Company is subject to regulatory supervision by CIMA. *See "Summary of the Articles—Regulation."* |
| **Taxation ...............................** | The Company is not subject to tax in the Cayman Islands (other than annual filing fees and an annual registration fee) under the current laws of the Cayman Islands. Potential investors should consult their own advisers as to the particular tax consequences to them of their proposed investment in the Fund. *See "Taxation."* |
| **Risks......................................** | An investment in the Shares is subject to various risks, including general investment risks, the performance of our borrowers, the Fund's narrow focus, portfolio concentration, conflicts of interest and the semi-illiquid nature of the Shares. *See "Risk Factors."* |

**Side Letters**............................ We may enter into letter agreements or other similar agreements ("**Side Letters**") with one or more Shareholders that provide those Shareholder(s) with additional and/or different rights (including with respect to fees or expenses associated with GCM and/or GAM),access to information, minimum investment amounts and liquidity terms) than such Shareholder(s) generally have under the Articles as described herein.  *See "Summary of the Articles—Side Letters."*

**Reports** .................................. Each Shareholder will receive annual financial statements of the Fund audited by an independent certified public accounting firm; periodic unaudited performance letters in the Directors' discretion; and other reports as determined by GCM.  We will bear all fees incurred in providing such reports to our Shareholders.

GCM may agree to provide certain Shareholders with increased access to GCM, GAM and their respective affiliates and employees for relevant information.

**Transferability** ....................... As a Shareholder, you may not assign or transfer your Shares without the Directors' consent, which consent may be given or withheld in their sole discretion.  Transfers of Shares are subject to other restrictions in the Articles, including compliance with ERISA and federal and state securities laws.

Due to these limitations on transferability, Shareholders may be required to hold their Shares indefinitely, unless they redeem Shares in accordance with the Articles.

*See "Redemptions—Transfer of Shares."*

**Conflicts of Interest**............. Because of GCM's role as sponsor and organizer of the Company and each Portfolio, the terms of the Articles and the Investment Management Agreement and other governing documents were not the result of arm's-length negotiation between GCM and the Company, any Portfolio, GAM or FTM.

GAM, from time to time, might have an incentive to favor its own accounts over ours or that of any Portfolio.  GCM, GAM and their affiliates may trade for their own accounts the same investments that any Portfolio makes, subject to their compliance with internal controls and procedures that are reasonably designed to mitigate any risk of favoritism.  *See "Risk Factors—Company Risks."*

**Auditors** ................................. Marcum LLP.  The Directors have the authority to remove the auditors and replace them with another firm of auditors which is approved by CIMA.  *See "Service Providers."*

**Fiscal Year** ............................ The Fund's fiscal year will be a calendar year and the Fund's first fiscal year will end on 31 December 2019.

**Administrator** ........................ The Directors have appointed NAV Fund Services (Cayman) Ltd. (the "**Administrator**") to provide the Fund with administrative services including accounting services, Share registry and transfers, and unaudited financial statement preparation.

The Directors have also appointed the Administrator's affiliate, NAV Consulting, Inc. as the NAV calculation agent of the Fund to, among other things, calculating our NAV and perform other accounting, back-office, data processing and related professional services.  The Directors have the right to change the Fund's administrator and NAV calculation agent.  *See "Service Providers."*

**AML**....................................... The Company and its affiliates intend to comply with the USA Patriot Act of 2001, as amended (the "**USA Patriot Act**"), along with all other applicable anti-money laundering, embargo and trade sanctions, or similar laws, regulations, requirements or regulatory policies including those of the Cayman Islands in this regard (collectively, the "**Requirements**").  Each Shareholder will be deemed to have agreed by reason of owning any Shares that it will take actions as may be necessary or advisable for the Fund (in the Directors' sole discretion) to comply with any Requirements, related legal process or appropriate requests (whether formal or informal) or otherwise.  Each Shareholder by executing the Subscription

Agreement consents, and by owning Shares is deemed to have consented, to disclosure by the Fund and its agents to relevant third parties of information pertaining to the Fund in respect of the Requirements or information requests related thereto. *See "Regulatory Considerations—Anti-Money Laundering—USA Patriot Act."*

## INVESTMENT STRATEGIES

The principal investment objective of the Fund is to achieve long-term capital appreciation with an emphasis on capital preservation irrespective of market direction.   We will loan our capital to borrowers such as Primary Borrower and they will thereafter acquire receivables or other assets, including discounted medical accounts receivables for MRIs, receivables generated from pain management treatments and from the funding of medical records selected in accordance with their criteria.  Our performance will be primarily driven by our borrowers' ability to source receivables or other sub-loans that will be fully repaid, with interest, as well as FTM's subadvisory services to GCM.  The Fund will not otherwise achieve gains resulting from the spread between the face amount of the receivables / assets and the discounted price borrowers pay for them.

The global financial crisis that began in 2008 illustrated that investment classes were far more correlated than most investors had otherwise suspected. Many asset classes fell together, regardless of size, sector or geographic location. Both developed and emerging markets alike experienced large declines as did commodities and non-treasury bonds. There was, however, a group of assets that were largely unaffected by the turmoil.  The Fund's lending strategy will follow that developed by FTM through 11 years of research, 9 years of its own investor feedback, and lessons FTM learned from its investments.

Our lending arrangements are uncorrelated to broader markets.  The Fund is expected to have a low beta to reinforce a low negative volatility and lack of correlation to the broader market.

The receivables we fund are expected to typically have a shorter average duration than traditional litigation finance (3-5 years), with multiple sources of receivable types.   However, we may fund the purchase of receivables or other assets with longer durations.   Based on FTM's prior experience, a meaningful percentage of these types of receivables funded are collected within the first 12 months with total collection within 30 months. Further, the majority of the receivables are expected to be fairly small, which can lead to reduced settlement times.

Our goal is to exceed the past returns achieved by a separate fund managed by FTM (the FTM Fund), based on expanded sourcing, wider opportunity spread and increased capital availability. However, there are important differences between our structure and that of any other vehicle managed by FTM, including that our sole source of gains will be the interest paid by borrowers—we will not participate in the gains our borrowers may realize through the discounted amounts they pay for receivables and other assets.  See "Risk Factors" below.

### The Primary Borrower's Funding Model

At the direction of GCM and FTM, Primary Borrower will use its network of hospitals, attorneys, medical service providers and MRI centers and negotiate discounted rates for the purchase of medical receivables in connection with personal injury cases in the U.S.

Primary Borrower will also conduct due diligence and if its criteria are met, will then proceed to purchase these receivables while normally taking a Primary Borrower Lien from the plaintiff against any settlement the plaintiff receives in his / her personal injury case. The Primary Borrower Liens typically are also executed by the plaintiff's attorney under which both the plaintiff and his / her lawyer agree to repay the full amount of the service provider's charges to Primary Borrower before disbursing other settlement proceeds to the plaintiff or his / her counsel.

The types of receivables we anticipate Primary Borrower sourcing and acquiring with capital we lend to it will be for surgeries, MRIs, pain management and for the purchase of pharmaceuticals on a lien.  While plaintiffs remain obligated under the Primary Borrower Liens to repay amounts to Primary Borrower if and when their cases settle, the ultimate source of such repayment is expected to be the insurance company against which the plaintiff made his / her claim.  For the medical records, the primary obligors are expected to be U.S. law firms whose creditworthiness has been reviewed by Primary Borrower.

Primary Borrower seeks to acquire receivables at a discount to their face value and to the extent a plaintiff's case settles (or other event that would trigger repayment to it) and Primary Borrower is repaid the full amount, Primary Borrower will retain the spread between the face amount of the receivable repaid and the discounted amount it acquired the receivable with the Fund's capital, net of interest owed to the Fund.

Under the Primary Loan Agreement, each advance we make to Primary Borrower must be repaid with interest upon the earliest of Primary Borrower's receipt of payments under the applicable Primary Borrower Liens (where Primary Borrower obtains such liens) or 30 months.   Most advances we make to Primary Borrower will accrue interest at an annual rate of 19% (with a higher rate for advances not secured by a lien), and upon the repayment of an advance, Primary Borrower will also pay 6% of the amount of the advance as additional interest.

Under the Primary Loan Agreement, our capital is secured by the Primary Borrower Note, as well as a blanket assignment by Primary Borrower to the Fund of all Primary Borrower Liens, and a security interest in certain other Primary Borrower assets.  Our capital and Primary Borrower's obligations under the Primary Loan Agreement will not be secured in any further manner, such as by personal or other guarantees.

### Primary Borrower Lien & Receivable Origination Process

The following roughly summarizes the processes involved in generating a majority of the Primary Borrower's receivables acquisitions and the path of the Fund's capital.  We may lend capital to the Primary Borrower without obtaining the same level of security.

1. A motor vehicle or other type of accident occurs.

2. One party is alleged to be at fault by the person harmed (called the "plaintiff").

3. The plaintiff needs medical care.

4. Primary Borrower requires that the plaintiff be represented by an attorney before funding any medical services.

5. The attorney and the plaintiff are usually required to execute a Lien under which plaintiff agrees to repay Primary Borrower first if and when the plaintiff's case settles.

6. Primary Borrower negotiates discounted rates for specified procedures with various medical service providers. These providers may have discounted their receivables to Primary Borrower based on patient referrals, volumes and expedited payments.

7. Plaintiff receives medical care.

8. The medical provider sends the medical claim (invoice) and notes to Primary Borrower.

9. Primary Borrower pays the contracted rate to provider on plaintiff's behalf.

10. The attorney makes demand or otherwise proceeds with plaintiff's case, usually seeking damages from the defendant's insurance carrier.

11. If and when the claim settles, funds are disbursed by the insurance carrier to the plaintiff's attorney's trust account.

12. The plaintiff's attorney distributes funds for expenses, fees, and medical liens.

13. The plaintiff's attorney distributes funds to Primary Borrower under the terms of the Primary Borrower Lien (or under an alternative instrument).

14. Primary Borrower's income is the spread between the contracted provider rate and the repayment from the plaintiff or other borrower.  The Fund's income is the interest Primary Borrower promised to pay the Fund under the Primary Loan Agreement.

### BORROWING

There are no restrictions in the Articles on borrowing and we may employ leverage, though we have no present plans to do so, and leverage may alter the tax consequences to Shareholders. The Directors may change their policy in the future and may exercise the borrowing powers given to them in the Articles.

### DIVIDEND POLICY

The Fund does not intend to distribute dividends to Shareholders. The Fund's interest income will be accumulated and from time to time a portion will be reinvested, along with principal advances repaid under the loans, to the extent not used to redeem Shareholders.

## THE COMPANY & THE FUND

### STRUCTURE

The Company is an exempted company incorporated with limited liability and registered as a segregated portfolio company in the Cayman Islands under the Companies Law. The Company was incorporated on March 22, 2018 and registered with CIMA on March 29, 2018.

A segregated portfolio company is permitted to create one or more segregated portfolios in order to segregate the assets and liabilities of the company held in respect of one segregated portfolio from the assets and liabilities of the company held in respect of any other segregated portfolio and/or the general assets and liabilities of the company. Under Cayman Islands law, the assets of one segregated portfolio will not be available to meet the liabilities of another segregated portfolio. Notwithstanding the segregation of assets and liabilities between segregated portfolios, a segregated portfolio company is a single legal entity and no segregated portfolio constitutes a legal entity separate from the company itself.

This Memorandum relates only to the Fund, a segregated portfolio of the Company. The Directors may at any time created additional segregated portfolios without notice to, or the consent of, the Shareholders. Each segregated portfolio may have, and is expected to have, different investment strategies from those of other segregated portfolios of the Company. The Company may issue participating shares of one or more classes in respect of a

- 11 -

segregated portfolio.

The Fund is open-ended and not structured as a closely held investment vehicle. The Fund was established with a view to accepting wide participation by Eligible Investors.

It is anticipated that the central management and control of the Company will be exercised by the Directors outside the jurisdictions in which GCM operates.

## SHARES

The Directors have initially created and designated one Class in respect of the Fund, being Class A Shares, which are being offered under the terms of this Memorandum. At any time the Directors may establish and designate additional Classes without notice to, or the consent of, the Shareholders. The Directors may differentiate between Classes on various bases, including as to the Dealing Currency, the fees payable, the level of information provided and redemption rights.

Shares do not carry voting rights except in relation to a modification of the rights attaching to a Class. The Management Shares, which are the voting shares in the Company, are held by GCM.

## SERVICE PROVIDERS

**The Directors reserve the right to change any service provider without notifying the Fund or seeking consent of Shareholders.**

### AUDITOR

Marcum LLP.  The auditor also may provide assurance and tax services to each of the Company and/or GCM, GAM and other funds or accounts controlled by the same and the Principal.  The Directors retain the authority to retain and dismiss the Fund's auditor with another firm of auditors which is approved by CIMA.

### ADMINISTRATOR

The Directors have engaged NAV Fund Services (Cayman) Ltd. as Administrator for the Fund under an Administration Agreement (the "**Administrator**").  The Administrator will perform certain administrative, accounting, registrar and transfer agency services for us.

NAV Consulting, Inc. has been engaged as the NAV calculation agent of the Fund (the "**NAV Calculation Agent**") under a Service Agreement entered into with the Fund (the "**NAV Calculation Agreement**").  The NAV Calculation Agent is responsible for, among other things, calculating our NAV and performing certain other accounting, back-office, data processing and related professional services all as described in the NAV Calculation Agreement.

NAV Fund Services (Cayman) Ltd. acts as the Administrator of the Fund under a Service Agreement entered into with the Fund (the "**Administration Agreement**," the Administrative Agreement and the NAV Calculation Agreement referred to collectively as the "**NAV Agreements**").  The Administrator is responsible for, among other things: (i) maintaining the register of Shareholders and processing the issuance and transfer of Shares; (ii) disseminating financial information to Shareholders; (iii) processing requests for redemption of Shares; (iv) keeping books and records of the Fund; and (v) performing other services in connection with the administration of the Fund as described in the Administration Agreement.

The NAV Agreements provide that the NAV Calculation Agent and the Administrator (referred to collectively as the "**NAV Providers**") will not be liable to the Fund, any Shareholder or any other person in absence of finding of willful misconduct, gross negligence, or fraud on the part of an NAV Provider. Furthermore, the Fund will indemnify and hold harmless the NAV Calculation Agent, the Administrator, their affiliates, and their respective officers, directors, shareholders, employees, agents and representatives (collectively, the "**NAV Parties**") from and against any liability, damages, claims, loss, cost or expense, including reasonable legal fees and expenses (individually, "**Loss**" and collectively, "**Losses**") arising from, related to, or in connection with the services provided to the Fund under the NAV Agreements, unless any such Losses are the direct result of the willful misconduct, gross negligence or fraud of NAV Providers.  In no event will the NAV Provider have any liability to the Fund, any Shareholder or any other person or entity which seeks to recover alleged damages or losses in excess of the fees paid to the NAV Providers by the Fund in the one year preceding the occurrence of any loss, nor will the NAV Providers be liable for any indirect, incidental, consequential, collateral, exemplary or punitive damages, including lost profits, revenue or data, regardless of the form of the action or the theory of recovery, even if the NAV Providers have been advised of the possibility of such damages or such damages were foreseeable.  Any claim brought against the NAV Providers in connection with the NAV Agreements will be barred unless it is initiated within one year of the earlier of the disclosure of the event which is the subject of such claim or the date that the party advancing such claim knew or could with due inquiry have known of such event.

The NAV Providers will not be liable to the Fund, any Shareholder or any other person for the actions or omissions of any agent, contractor, consultant or

other third party performing any portion of the services under the NAV Agreements absent a finding of gross negligence or fraud on the part of an NAV Provider in appointing such agent, contractor, consultant or other third party. The NAV Providers will not be liable to the Fund, any Shareholder or any other person for actions or omissions made in reliance on instructions from the Fund or advice of legal counsel.

The services provided by the NAV Providers are purely administrative in nature. The NAV Providers have no responsibilities or obligations other than the services specifically listed in the NAV Agreements. No assumed or implied legal or fiduciary duties or services are accepted by or may be asserted against the NAV Providers. The NAV Providers do not provide tax, legal or investment advice, nor do they have any duty to communicate with Shareholders other than as provided in Exhibit A of the NAV Agreements. The NAV Providers do not have custody of the Fund's assets, they do not verify the existence of, nor do they perform any due diligence on our underlying investments. In connection with the payment processing functions, the NAV Providers will not be responsible for performance of the due diligence on payment recipients other than in connection with payments for Shareholders' withdrawals from the Fund, which are subject to anti-money laundering review functions of the services

The NAV Agreements also provide that it is the obligation of the Fund's management, and not of the NAV Providers, to review, monitor or otherwise ensure compliance by the Fund with the investment policies, restrictions or guidelines applicable to it or any other term or condition of the Fund's offering documents and with laws and regulations applicable to its activities. Moreover, the Fund's management's responsibility for the management of the Fund, including the valuation of our assets and liabilities, the oversight of the services provided by the NAV Providers and the review of work product delivered by the NAV Providers will not be affected by or limited by any of the services provided by the NAV Providers.

The NAV Providers are entitled to rely on any information, including valuation information, received by the NAV Providers from the Fund, the Fund's management or other parties, including broker-dealers and data vendors, without independent verification, audit, review, inquiry, or performing other due diligence and the NAV Providers will not be liable to the Fund, any Shareholder or any other persons for losses suffered as a result of the NAV Providers relying on incorrect information. The NAV Providers have no responsibility to review, independently value, verify,

compare to other pricing sources or otherwise perform due diligence on the valuation information. The NAV Providers may accept such information as accurate and complete without independent verification. Furthermore, the NAV Providers will not be liable to the Fund, any Shareholder or any other person for any loss incurred as a result of an error or inaccuracy from any pricing or valuation service or data service provider or delay, interruption in service or failure to perform of any pricing or valuation service or data service provider used by the NAV Providers.

The information on investor statements and other reports produced by the NAV Providers will not be considered an offer to sell or a solicitation of an offer to purchase any Shares, nor may it be used to induce or recommend the purchase or holding of Shares. The NAV Agreements bar non-parties from asserting third party beneficiary claims against the NAV Providers.

The Fund pays the NAV Providers fees out of the Fund's assets, generally based upon the size of the Fund, in accordance with the NAV Providers' standard schedule for providing similar services, subject to a monthly minimum. Either party may terminate the NAV Agreements on 60 days' prior written notice as well as on the occurrence of certain events. Shareholders may review the NAV Agreements by contacting the Fund; provided, that the NAV Providers reserve the right not to disclose the fees payable thereunder.

The NAV Providers are not responsible for the preparation of this Memorandum or the activities of the Fund and therefore accept no responsibility for any information contained in any other section of this Memorandum.

### LEGAL COUNSEL

GAM has appointed outside legal counsel to the Company, the Fund, GAM, GCM and certain of their respective affiliates ("**Counsel**"). However, Counsel does not represent any Subadviser or any Shareholder of any Portfolio and each Shareholder is urged to consult with its, his or her own counsel.

Counsel has been retained to prepare offering documentation in connection with the offering of Shares, but has not and will not conduct any due diligence with regards to the offering, any Portfolio, the Company, GCM, GAM, the Principal, any of their affiliates, or any of the information contained in this Memorandum. Counsel has not provided tax counsel and/or guidance regarding the efficiency of the structure for tax purposes. If a conflict of interest or dispute arises between GCM, a Portfolio, GAM and/or any Shareholder, by investing in the Shares,

Shareholders acknowledge that Counsel may elect to serve as counsel to GCM and GAM and not to the Company, any Portfolio, or to any Shareholder, notwithstanding the fact that, in certain cases, the fees paid to Counsel are paid through or by the Fund.

## MANAGEMENT & ADMINISTRATION

### BOARD OF DIRECTORS

The Directors are responsible for the overall management and control of the Company in accordance with the Articles. However, the Directors have delegated responsibility for day-to-day administrative functions to the Administrator and responsibility for making day-to-day investment decisions to GCM.

The Directors are Michael E. Griffin and Simon Clark, and their biographical information is provided below under *"MANAGER—Background of the Management Principals."*

### Retirement of Directors

The Articles do not stipulate a retirement age for the Directors nor do they provide for retirement of the Directors by rotation. The Directors may at any time elect to appoint another person to serve as a Director or to fill a vacancy.

### Liability of Directors

The Articles provide that no Director will be liable to the Company for any loss or damage in carrying out his functions unless that loss or damage arises through the actual fraud, willful default or gross negligence of such Director. Each Director is entitled to be indemnified out of the assets of the relevant segregated portfolio against any liability, action, proceeding, claim, demand, cost, damage or expense (including any legal expense) whatsoever incurred by him as a result of any act or failure to act in carrying out his functions other than such liability (if any) that he may incur by his own actual fraud, willful default or gross negligence.

### Insurance

The Company may purchase and maintain insurance for the benefit of any person who is or was a Director.

### MANAGER

The Company has appointed GAM to act as manager of the Company pursuant to an agreement between the Company and the Manager (the IMA). Both GCM and GAM are managed by the Principal. The IMA may be terminated by either party upon 30 days' notice. Under the IMA, the Fund will pay GAM the Platform Fee, the Management Fee and the Incentive Fees.

### Background of the Management Principals

MICHAEL E. GRIFFIN, FUND DIRECTOR, GCM / GAM MANAGING MEMBER.

Michael E. Griffin has served in executive roles in the alternative asset management industry for the past 25 years. He has been an advocate of daily transparency and robust investor reporting since 1985. He pioneered the design of the data model and technology which provided the transmission of T+0 reporting and the daily liquidity feature for Fenchurch Capital Management a fixed income arbitrage fund.

The commitment toward daily trade date transparency and liquidity was advanced further in his founding of Spectrum Global Fund Administration (1998-2010). His data model and reporting designs were the foundation of the proprietary technology which distinguished Spectrum from its peers. HedgeACT and its revolutionary technology will elevate his commitment to daily reporting and transparency with the launch of a new paradigm for alternative asset management platforms.

Prior to Spectrum, Mr. Griffin was the Chief Operating Officer of Fenchurch Capital Management (1985-1998), a $750 million hedge fund, and served as a Director of Kleinwort Benson Limited. In addition, Mr. Griffin also served as Chief Operating Officer for Virginia Trading Corporation (1985-1991), a futures commission merchant and its subsidiary, Virginia Futures Management Corporation, a registered commodity pool operator.

Mr. Griffin began his professional career at Coopers & Lybrand (1980-1985). As a manager at Coopers & Lybrand, he specialized in the Commodities and Securities practice. He earned a B.S. in Business Administration from the University of Illinois and is a Certified Public Accountant.

SIMON CLARK, FUND DIRECTOR.

Simon Clark is a seasoned wealth management professional who has held leadership positions in the United States, Europe, Asia, and South America. He has been consistently engaged in the creation and management of investment, credit and ancillary products for the High Net Worth and Family Office communities.

At S.G. Warburg he was part of the team that transitioned the venerable English Merchant Bank into an industry leading investment firm, Mercury Securities. His most recent roles have seen him lead the Private Bank at Lloyds/Bank of Scotland in the UK (an $27BN combined enterprise), and most recently CEO for the US expansion of a Geneva-based Swiss Private Bank.

Simon joined the HedgeACT leadership team in 2016, and brings a complimentary skill set which broadens the scope and capabilities of the leadership group.

Throughout this Memorandum, we refer to Messrs. Griffin and Clark as the "**Management Principals**."

### Other Activities of GCM, GAM, the Management Principals & Affiliates.

None of GCM, GAM or their respective managers, members, officers, employees, agents and affiliates is required to manage the Company or the Fund as its sole and exclusive function.  Each may engage in other business activities, including competing ventures and/or other unrelated employment, and is only required to devote such time to the Company as the Managing Member or the Investment Manager deems necessary to accomplish our purposes. Similarly, although the Management Principals expect to devote a significant amount of their time to the business of GCM, GAM and the Company, they are only required to devote so much of their time to these entities as they determine in their sole discretion.

In addition to providing services to us and each segregated portfolio, each of GCM, GAM, and the Management Principals may provide investment management and other services to other parties and may manage and/or establish affiliated funds in the future, including those that may employ an investment program and strategy similar to that of the Fund.

### SUBADVISER

FTM Limited, a company organized under the Vanuatu Company's Act, acts as GCM's subadviser respecting the Fund's assets.  FTM is registered with the Vanuatu Financial Services Commission as an investment entity and as a Public Limited Company. FTM's Directors are Endre Stephen Dobozy and William Barry Dalzell.

GCM and the Fund have entered into the Sub-Advisory Agreement with FTM.  Under the Sub-Advisory Agreement, GCM has engaged FTM to liaise directly with Primary Borrower to evaluate and advise on the purchase of receivables, and to otherwise supervise Primary Borrower's performance under the Primary Loan Agreement.  FTM will also review the receivables purchased and their invoice costs and otherwise monitor Primary Borrower's performance under the Loan.

The term of the Sub-Advisory Agreement will continue until terminated by either party upon 90 days' notice, or by GCM immediately upon a cause event.

### FEES & EXPENSES

#### ADMINISTRATION FEES

The NAV Providers will receive fees out of the assets of the Fund for providing administration and transfer agency services.  The NAV Providers will also be entitled to various transaction and processing fees and to be reimbursed for all out of pocket expenses properly incurred by it in the performance of their respective duties.

#### PRELIMINARY EXPENSES

The Company will pay the costs and expenses of, and incidental to, the initial offering of Shares. Such costs and expenses include those relating to the establishment of the Company in the Cayman Islands, the negotiation and preparation of the contracts to which the Company is a party and the fees and expenses of professional advisers.

These preliminary expenses are estimated to be approximately $60,000 and will be amortized on a straight line basis over a period of five years from the initial issue of Shares. The Directors may shorten the period over which such expenses are amortized. Under IFRS, establishment costs should be expensed as incurred and amortization is not consistent with IFRS. However, the Directors believe that the amortization of establishment costs is more equitable and are of the opinion that the departure from IFRS is unlikely to be material to the overall financial statements of the Fund. To the extent that the preliminary expenses policy adopted in respect of the Fund deviate from IFRS, certain adjustments may be made in the annual accounts of the Fund in order to comply with IFRS.

#### OPERATING EXPENSES

The Fund will bear all expenses related to its investment activities, including fees and expenses it is responsible for under the loan agreements, fees and expenses of any custodian, escrow agent and other investment related service providers appointed in respect of the Fund.

The Fund will also bear expenses incurred in connection with its operations including (i) fees and expenses of service providers, advisers and consultants, including those utilized to oversee our borrowers' performance, (ii) indemnification expenses and the cost of insurance against potential indemnification liabilities, (iiii) legal, administrative, accounting, tax, audit and insurance expenses, (iv) all registration fees, taxes and corporate fees payable to any relevant government, agency or regulatory authority, (v) expenses with respect to

investor communications, including marketing expenses, expenses of meetings of Shareholders and costs of preparing, printing and distributing financial statements and other documents, (vi) Directors' fees (if any) and expenses, and (vii) litigation or other extraordinary expenses.

To the extent that any fees and expenses incurred by the Company do not relate to a specific Portfolio, such fees and expenses will be apportioned to each Portfolio on a *pro rata* basis.

## RISK FACTORS

**An investment in the Fund involves significant risks not associated with other investment vehicles and is suitable only for persons of adequate financial means who have no need for liquidity in this investment. There can be no assurances or guarantees that (i) The Fund's investment strategy will prove successful, or (ii) investors will not lose all or a portion of their investment in the Fund.**

**You should consider your investment in the Fund as a supplement to an overall investment program and should only invest if you are willing to undertake the risks involved.  In addition, investors who are subject to income tax should be aware that an investment in the Fund is likely (if the Fund is successful) to create taxable income or tax liabilities in excess of cash distributions to pay such liabilities.   You should therefore bear in mind the risk factors and conflicts of interest before purchasing Shares as describe below.**

### COMPANY RISKS

*Dependence upon GCM, GAM & the Management Principals.*   The success of the Company and the Fund depend on the management of GCM, GAM and FTM and primarily on the skill and acumen of the Management Principals at the Fund level and FTM.  If the Management Principals and/or FTM should cease to participate in the Fund's and/or its affiliates' businesses, the ability of the Fund to select attractive investments through borrowers and manage its portfolio could be materially impaired.

As a Shareholder, you should be aware that you will have no right to participate in the management of the Company or the Fund, and you will have no opportunity to select or evaluate any investments made or strategies employed by the Fund. Accordingly, you should not invest in the Fund unless you are willing to entrust all aspects of the management of the Fund to the discretion of GCM, GAM and their delegates, including FTM.

*Limited operating history.*  GAM has not managed a fund with investment objectives similar to the Fund's before organizing the Fund, nor has FTM acted as a subadviser for a fund structured like the Fund in the past.

GCM was formed in 2014 and has a limited operating history upon which prospective investors may evaluate the Fund's future performance.   Further, GAM has a limited track record.

*Limited liquidity of Shares.* An investment in the Fund involves substantial restrictions on liquidity and the Shares are not freely transferable.  There is no market for the Shares, and no market is expected to develop.  Additionally, transfers are subject to the consent of the Directors, which consent may be granted or withheld in their discretion.  Consequently, Shareholders will be unable to liquidate their Shares except by redeeming Shares in accordance with the Articles.  Shareholders may be unable to liquidate their investment in the event of an emergency or for any other reason.   Although a Shareholder may attempt to increase its liquidity by borrowing from a bank or other institution, Shares may not readily be accepted as collateral for a loan.  In addition, the transfer of a Share as collateral or otherwise to achieve liquidity may result in adverse tax consequences to the transferor.

*Lack of registration.* The Shares have not been registered under the 1933 Act nor under the securities or "blue sky" laws of any state and, therefore, are subject to transfer restrictions.  In connection with your purchase of Shares, you must represent that you are purchasing the Shares for investment purposes only and not with a view toward resale or distribution.  Neither the Company nor GCM nor the Directors have any plans or assumed any obligation to register the Shares.  Accordingly, the Shares may not be transferred without documentation acceptable to the Directors, which may include an opinion of counsel that the transfer will not involve a violation of the registration requirements of the 1933 Act or require registration by the Company and/or the Fund under the 1940 Act. These restrictions on transfer are in addition to those found in the Articles.  Ordinarily, this means that transfers will be restricted.

*Withdrawal of capital.*  A Shareholder's ability to withdraw funds from the Fund is restricted in accordance with the redemption provisions contained in this Memorandum and the Articles.  In addition, any redemptions by investors will mean we have less capital re-invested under the loans, eroding our income source.  Reduction in the size of the Fund could make it more difficult to generate a positive return or to recoup losses due to, among other things, reductions in our ability to take advantage of particular investment opportunities or decreases in the ratio of the Fund's income to its expenses.

*Limitations on redemptions.*  The Fund's ability and

obligation to redeem Shares (after Lockup Periods) will be subject to our borrowers' performance. The Directors may suspend or postpone redemptions, calculations of NAV or payments upon any redemptions (in whole or in part) (i) during the existence of any state of affairs which, in the Directors' opinion, makes the disposition of our investments impractical or prejudicial to the Shareholders, or where such state of affairs, in the Directors' opinion, makes the determination of the price or value of our investments impractical or prejudicial to the Shareholders; (ii) where any withdrawals or distributions, in the Directors' opinion, would result in the violation of any applicable law or regulation; or (iii) for such other reasons or for such other periods as the Directors may in good faith determine**.** Furthermore, in the event that Shareholders, in the aggregate, request redemptions of Shares representing more than 25% of our NAV as of any Redemption Date, the requested amounts may, in the Directors' sole discretion, be reduced to an amount equal to 25% of all Shares then subject to Redemption Notices as of such date, and satisfied on a pro-rata basis, based on the respective amounts of requested redemptions by each redeeming Shareholder. Redemption Notices that are deferred due to such limitation or any borrower default may be revoked by the redeeming Shareholder, and if not revoked, will be given priority at subsequent Redemption Dates (again subject to the above redemptions % limitation). In the interim, all of a Shareholder's remaining Shares (including the Shares subject to such deferred Redemption Notice) would remain subject to our performance.

*Impact of Side Letters.* We may from time to time enter into Side Letters with one or more Shareholders that provide such Shareholder(s) with additional and/or different rights (including with respect to access to information, minimum investment amounts and liquidity terms) than such Shareholder(s) have under this Memorandum.

Neither the Company nor the Fund will be required to notify any or all of the other Shareholders of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the Company or the Fund be required to offer such additional and/or different rights and/or terms to any or all of the other Shareholders. The Fund and the Company may enter into such Side Letters with any party as the Directors may determine in their absolute discretion at any time. The other Shareholders will have no recourse against the Fund and/or the Company, the Directors or GCM and/or any of their affiliates in the event that certain Shareholders receive additional and/or different rights and/or terms as a result of such Side Letters.

*Concentration of investment.* Our sole source of income is expected to be the interest payable by borrowers to us. If a borrower were to default or is otherwise unable to repay us because plaintiffs' cases do not timely settle (as applicable) or otherwise, we will lose money.

*Comparisons to FTM-sponsored investment vehicles.* Prospective investors evaluating the past performance of the FTM Fund must appreciate that the FTM Fund's structure differs from the Fund's structure, including the laws under which the FTM Fund is organized, and that an investor's after-tax results may differ from what they could achieve in the FTM Fund. More importantly, the FTM Fund achieved gains by sharing in the gains realized by Primary Borrower. The Fund will not share in those gains and its only income will from interest payable by Primary Borrower. Finally, the performance achieved by the FTM Fund was achieved at different times and under differing circumstances. Therefore, investors should not expect the Fund to achieve results that are similar to those achieved by the FTM Fund or any other vehicle.

*Operating deficits.* The expenses of operating the Fund may exceed its income, thereby requiring that the difference be paid out of the Fund's capital, reducing the investments and potential for profitability.

*No distributions.* The Fund will not typically make distributions to the Shareholders, but instead reinvest substantially all of our income, if any, in our revolving loans (subject to our borrowers' ability to deploy our capital in receivables or other asset purchases). Cash that might otherwise be available for distribution will also be reduced by payment of our obligations, payment of our expenses (including fees payable and expense reimbursements to GCM and GAM) and establishment of appropriate reserves. As a result, if we are profitable, Shareholders in all likelihood will be credited with our net income, and will incur the consequent income tax liability (to the extent that they are subject to income tax), even though Shareholders receive little or no distributions from the Fund.

*Risk management limitations.* GAM's and FTM's efforts to identify, monitor and manage the loans' risks may not be fully effective. Some methods of managing risk will be based upon observed historical market behavior. As a result, these methods may not predict future risk exposures, which could be significantly greater than the historical measures indicate. Other risk management methods may depend upon evaluation of information regarding markets that is publicly available or otherwise accessible. This information may not in all cases be accurate,

66758085.10

complete, up-to-date or properly evaluated. Management of operational, legal and regulatory risk requires, among other things, policies and procedures to record properly and verify a large number of transactions and events. If we are unable to manage our risk exposure effectively, we could experience dramatic losses or insolvency.

*Supervision of lending operations.* Except as provided in the IMA, the management of our operations are vested solely in the Directors. The Shareholders have no right to take part in the conduct or control of our business. In connection with the management of our business, the Directors, GCM and GAM will devote only such time to their matters as they, in their sole discretion, deems appropriate.

*Limitation of liability & indemnification of the Directors, GCM, GAM & affiliates.* The Articles provide that the management personnel for the Fund will be indemnified against, and will not be liable for, any action or inaction in connection with our business and affairs unless such action or inaction is determined by a final, non-appealable court of competent jurisdiction to constitute gross negligence or willful default. The IMA also provides similar protections to GAM. Therefore, a Shareholder may have a more limited right of action against management personnel (and certain of their respective affiliates) than a Shareholder would have had absent these provisions in the Articles. The SEC's policy is that indemnification for violations of securities laws is against public policy and therefore unenforceable.

*No minimum size.* We may begin or continue operations without attaining or maintaining any particular level of capitalization. At low asset levels, we may be unable to take advantage of potential risk diversification through the loans.

*Lack of insurance.* The Fund's assets are not insured by any government or private insurer except to the extent portions may be deposited in bank accounts insured by the United States Federal Deposit Insurance Corporation or with brokers insured by SIPC and such deposits and securities are subject to such insurance coverage (which, in any event, is limited in amount). Therefore, in the event of the insolvency of a depository or custodian, we may be unable to recover all of our funds or the value of our assets so deposited. Additionally, Primary Borrower has not specifically insured any of its obligations under the Primary Loan.

*Returns of distributions.* No Shareholder, in its capacity as such, will be personally liable for the debts, liabilities, obligations or commitments of the Fund,

and each Share, when issued and fully paid for in accordance with the provisions of the related Subscription Agreement, will be fully paid and non-assessable. However, if the Fund incurs a tax or is required to withhold tax from income attributable to a Shareholder, the Fund will pay or withhold such tax, as the case may be, and such payment or withholding will be treated as an amount of cash distributed to the Shareholder to which it is attributable.

*Withholding of distributions.* Under certain circumstances, the Directors may find it necessary upon redemption by one of the Shareholders to establish a reserve for contingent liabilities and withhold a certain portion of such Shareholder's capital. In addition, at any given time, the Fund may not be able to liquidate sufficient assets to make required payments to redeeming Shareholders or to satisfy all of its obligations upon dissolution.

*Cross-Class liabilities.* The Fund may be offered in multiple Classes of Shares. Although, as a matter of internal accounting, separate accounts and records will be established for each Class of Shares in the Fund as a whole is one legal entity. Therefore, the assets of each Class may be available to creditors of other Classes of Shares. In the event the Fund becomes insolvent or liquidates or its assets are insufficient to meet its liabilities, all assets of the Fund may be utilized to meet its liabilities and not just the amount of assets of any particular Class. The assets attributable to any one Class of Shares may therefore be used to satisfy the liabilities attributable to other Classes where the assets attributable to those other Classes are insufficient.

*Withdrawal & expulsion of the Directors.* No Shareholder or Shareholders, individually or collectively, has any right, power or authority to remove or expel any Director, cause a Director to resign or appoint a successor in the event of the resignation or bankruptcy of a Director or otherwise, unless such right, power or authority is conferred on it or them by law.

*Confidentiality.* The Shareholders generally will be required to keep confidential all matters relating to the Company and the Fund and their business and affairs (including communications from the Directors and GAM). The name "HedgeACT International Ltd." (or any derivation and any use thereof) belongs to HedgeACT International Ltd. and is a limited use license, licensed to the Fund and the Shareholders will disclaim expressly any interest therein.

*Term of the Company & the Fund.* The term of the Company and the Fund are unlimited. The Directors, however, may dissolve the Fund or the Company as

a whole at any time upon giving written notification of such dissolution to the relevant Shareholders. Upon the dissolution of the Company or the Fund, Shareholders will have no further redemption rights, but only the right to receive distributions from the Fund in connection with winding up.

## LOAN RISKS

*Credit risks.* While loan agreements will provide that borrowers promise to repay amounts we loan it, plus interest, a borrower's ability to timely repay us will often be (depending on how borrowers deploy our capital) exclusively reliant on the strength of cases pursued by plaintiffs, timely settlement of the same, and plaintiffs' honoring of any liens. Ultimately, the Fund's financial performance will hinge on the outcome of cases over which neither the Fund, GCM, FTM or the borrower will have no impact or influence whatsoever.

Additionally, if a borrower were to default under a loan agreement, its ability to repay the Fund absent full repayment to it by plaintiffs may be restricted.

*Collateral.* While borrowers will execute a promissory note in favor of the Fund and grant the Fund a security interest in certain of its assets in connection with the loans, the Fund does not expect to receive any personal or other guarantees from borrowers, and therefore the chief collateral supporting our loans will normally be liens such as the Primary Borrower's Blanket Lien under which Primary Borrower assigns to us the Liens made by individual plaintiffs. Furthermore, a borrower may have senior debt, and such senior lenders will have preferential rights to our borrower's assets to secure the repayment of the senior debt.

*Inadequate diligence on cases.* While most borrowers will review cases underlying their ability to obtain repayment, their review of cases (or other assets they acquire) will not be comprehensive and therefore the case underlying any lien may never settle, which would trigger the borrower's obligation to repay to us such amount under the loan.

*Inadequate diligence on counsel.* Borrowers may be particularly reliant on lawyers to litigate claims with due skill and care. If they are not able to do this, or do not do this for other reasons, it is likely to have a material adverse effect on the value of the borrower's investment. While we would expect borrowers to evaluate the lawyers involved in any receivables purchase, there is no guarantee that the outcome of a case will be in line with the lawyers' assessment of the case or in line with the expected skill and care from the lawyers.

*Professional duties.* Our borrowers will not own or control a claim backing up any lien, and as a result a borrower will not be the client of the law firm representing the any plaintiff that provides a lien. Accordingly that law firm may be required to act in accordance with its client's wishes rather than those of our borrower or may be subject to an overriding duty to the courts.

*Enforceability of Primary Borrower Liens.* Under the Primary Loan Agreement, Primary Borrower has represented to us that the form of the liens it acquires and assigns to us under the Primary Borrower Blanket Lien will be enforceable against the plaintiffs and their counsel, there may be instances where Primary Borrower's or the Fund's ability to enforce a Primary Borrower Lien are disputed or impeded. In those cases and in light of the often small size of the receivables associated with a given lien, it may be difficult or impracticable for either Primary Borrower or the Fund to actually enforce a Primary Borrower Lien, and we could therefore lose money if Primary Borrower fails to repay amounts secured by a given lien.

*Borrowers' performance of their loan agreement.* A given borrower may not be a heavily-capitalized company, may have senior debt and other unsecured debt, and the Fund's access to knowledge of a borrower's financial performance may be limited. Borrowers will usually primarily rely on the settlement of plaintiffs' cases to provide the funding to repay amounts we loan to them, along with accrued interest.

*Diligence on borrowers.* Neither the Fund, GCM nor FTM has engaged any outside party to investigate or vet Primary Borrower, its operations or financial strength. While GCM and/or FTM have investigated our borrowers, such investigation may not have identified matters that could negatively impact their ability to perform under the loans.

*Lack of regulation.* Our borrowers may not be registered in any capacity—as is the case with Primary Borrower. While borrowers will represent to the Fund that their purchasing activities do not trigger the application of any laws or regulations, to the extent a state or other authority viewed a borrower's lending program as lending to individuals, the borrower could face unknown penalties, which could adversely impact its ability to repay the loan to the Fund, limit its ability to continue its planned lending program for us, or otherwise negatively impact the Fund's operations.

Changes in laws, regulation or ethical rules could further reduce or limit opportunities for Primary Borrower to make investments or could result in the

reduction or extinction of the value of investment already concluded by Primary Borrower in such jurisdictions, and such changes are regularly proposed by groups opposed to litigation proliferation and others.

**REGULATORY RISKS**

*Accounting standards.* Various accounting standards could cause the Fund to establish reserves for certain expenses or taxes or could otherwise impact NAV. A prospective Shareholder should be aware that, among other things, these accounting standards could have a material adverse effect on the periodic calculations of NAV, including reducing NAV to reflect reserves for expenses, fees, allocations or taxes that may be payable in respect of prior periods. This could adversely affect certain Shareholders, depending upon the timing of their purchase and redemption of Shares.

*Restrictions on investment activity.* Certain institutions may be restricted from directly utilizing investment strategies we plan to use. Such institutions, including entities subject to ERISA, should consult their own advisors, counsel and accountants to determine what restrictions may apply and whether an investment in the Fund is appropriate.

*Lack of regulatory oversight.* As of the date of the Memorandum, neither GCM, GAM nor FTM are directly supervised or monitored by any regulatory authority, except that GAM is registered with the CFTC as a commodities trading advisor. Neither the Company nor the Fund is registered as an "investment company" under the 1940 Act. Consequently, Shareholders would not benefit from some of the protections afforded by regulatory oversight. As of the date of this Memorandum, GAM is not registered with the SEC as an investment adviser under the Advisers Act.

**TAX RISKS**

*Classification of the Fund.* The Fund intends to be treated as a partnership for federal income tax purposes and not as a corporation. However, there is no explicit authority addressing whether a Cayman Islands' exempted company and each segregated Portfolio are classified as separate entities for U.S. federal income tax purposes. While the Company believes that there are substantial arguments in favor of classifying each segregated portfolio as a separate entity eligible to elect its separate classification for U.S. federal income tax purposes, no assurance can be given that IRS would not assert or prevail in asserting that the Fund and the Company should be treated as a single entity and that the resulting entity would not be treated as a corporation.

In addition, certain partnerships may be taxable as corporations for U.S. federal income tax purposes under the publicly-traded partnership ("**PTP**") rules. The Fund expects that under the facts and circumstances test in the Regulations, the Fund will not be treated as a PTP. However, no assurance can be given that the IRS would not challenge this position and would not prevail in challenging this position.

If the Fund were classified as a corporation for U.S. federal income tax purposes, it could be considered a "passive foreign investment company" ("**PFIC**"). If the PFIC provisions were applicable, U.S. investors could be required to treat all or a portion of the gain recognized on the sale of PFIC stock and the amount of any excess distribution as ordinary income. In addition, all or a portion of such income may become subject to an interest charge on the deferred tax amount.

In addition, it is possible that the Fund could be considered a controlled foreign corporation ("**CFC**"). If the Fund was considered to be a CFC, each U.S. person that held 10% or more of voting power or value of the Fund could be required to recognize its share of the Fund's net interest income (and certain other types of passive income) annually, regardless whether the Fund made any distributions. U.S. persons that did not own 10% or more of the voting power or value of the Fund would still be subject to the PFIC rules.

*Investment by U.S. Investors.* Each Shareholder that is a U.S. investor is required to report its income tax return its distributive share of interest income and other tax items from the Fund regardless whether the Shareholder receives any distributions from the Fund.

*Investment by Non-U.S. Investors.* The Fund believes that the interest income received from the borrowers will be considered U.S. source interest income which is not effectively connected with a U.S. trade or business. As a result, the portion of such interest which is allocable to a Shareholder will be subject to a gross basis tax of 30%, which our borrowers will be required to withhold from such payment, unless the Shareholder can demonstrate that either it is a non-U.S. investor and is entitled to a reduction or exemption from withholding or it is a U.S. investor.

The Fund intends that interest paid to it on the loans will qualify for the portfolio interest exception to withholding tax in the case of qualifying foreign Shareholders. However, if a non-U.S. investor does not qualify for the portfolio interest exception, its portion of the interest income will be subject to a 30% gross basis withholding tax unless such person qualifies for a reduction in the rate of withholding tax

under an income tax treaty between the United States and such person's country of residence and such person provides an appropriate beneficial ownership certificate to the Fund.

If the IRS were to successfully assert that the Fund was engaged in the business of lending through a fixed place of business in the U.S., the interest on the loans could be considered income which is effectively connected with a U.S. trade or business. In such case, non-U.S. Shareholders could become subject to income tax in the United States on the interest income. In addition, non-U.S. Shareholders which are foreign corporations could become subject to branch profits tax on the dividend equivalent amount of their effectively connected income

*Investment by Tax-Exempt Entities.* Qualified pension plans, individual retirement accounts and certain other tax-exempt entities are generally subject to federal income tax with respect to any unrelated business taxable income ("**UBTI**") and are required to file federal income tax returns if they have gross UBTI in excess of $1,000. UBTI includes income derived from a trade or business carried on by a tax-exempt entity or by a partnership of which the entity is a member. In addition, any gain or income earned from "debt financed" property is treated as income from an unrelated business even if such income would otherwise not be UBTI.

UBTI generally does not include interest, including a tax-exempt partner's distributive share of such items of a partnership. However, it is possible that IRS would assert that the Fund's activities constitute a trade or business of lending money and that the interest income derived thereby constitutes UBTI.

For certain types of tax-exempt entities, the receipt of any UBTI may have extremely adverse consequences. In particular, for charitable remainder trusts, the receipt of any taxable income from UBTI during a taxable year will result in the taxation of all of the trust's income from all sources for such year. A tax-exempt organization must also include in its UBTI its "unrelated debt-financed income" (and its allocable share of the unrelated debt-financed income of any partnership in which it invests). Although the Fund does not presently plan to borrow money to finance its lending activities, it reserves the right do so. If it were to do so, income derived from the Fund could be considered UBTI. In addition, if a tax-exempt investor acquires debt-financed Shares in the Fund, such investor may have unrelated-debt financed income.

*The Fund may be subject to other taxes.* The Fund may be subject to other taxes, such as state and local and foreign income taxes.

*Future tax legislation.* Future amendments to the Code, other legislation, new or amended Regulations, administrative rulings or guidance by the IRS, or judicial decisions may adversely affect the federal income tax aspects of an investment in the Fund, with or without advance notice, and retroactively or prospectively.

*US Foreign Account Tax Compliance Act.* FATCA imposes a withholding tax of 30% on certain US-sourced gross amounts paid to certain "Foreign Financial Institutions," including the Fund, unless various information reporting requirements are satisfied. To comply with its obligations under applicable legislation, the Fund will be required to report FATCA information to the Cayman Islands Tax Information Authority, which in turn will report relevant information to the United States Internal Revenue Service. If we are not able to comply with reporting requirements, we may be required to withhold on income and proceeds paid or allocated to the account of an Investor.

## OPERATIONAL RISKS

*Limited operating history.* The Fund has limited operating history. The past performance of the Company, HedgeACT, GCM, GAM, FTM or funds managed by FTM is not indicative of future performance, and none of such parties can predict the Fund's future performance.

*Substantial fees & expenses.* The Company and the Fund are subject to substantial fees, transaction costs and other costs and other expenses, regardless of whether the Fund realizes any profits.

*Miscalculation of NAV.* To the extent that any fair value assigned to any investment held by the Fund differs from the actual value upon disposition of the investment or the receipt of additional more current information, the NAV may be understated or overstated, as the case may be. In light of the foregoing, there is a risk of overpayment or underpayment to Shareholders who redeem prior to the end of an accounting period. In addition, there is risk that an investment in the Fund during such period by a new Shareholder (or an additional investment by an existing Shareholder) could dilute the value of such an investment for the other Shareholders if the designated fair value of such an investment is higher than a determinative assigned value. Further, there is risk that a new Shareholder (or an existing Shareholder that makes an additional investment) could pay more than it might otherwise if the actual value of such investments is lower than such assigned value.

*Limitations on withdrawals & redemptions.* While Shareholders will have certain withdrawal rights as

described in the Memorandum, we may not permit redemptions at the same intervals or on the same notice. The Directors have authority to restrict Shareholders' redemption rights, on a *pari passu* basis among all Shareholders, if and to the extent we are unable to obtain sufficient funds to honor redemption requests, through borrowing, or otherwise. Shareholders requesting redemption thus may experience delays in receiving redemption payments.

*Withdrawals.* The Fund has a minimum redemption amount of $100,000.  A redemption will occur as of the last Business Day of each calendar quarter (and at such other times and in such other amounts with the consent of, and upon such terms of payment as may be approved by, GCM in its discretion) upon at least 105 days' prior written notice to the Administrator.  Unless the Directors consent, partial redemptions may not be made if they would reduce the value (at current NAV) of a Shareholder's remaining Shares below $100,000.

GCM may require a Shareholder to redeem any or all of the Shares for any reason or no reason upon at least five days' notice.  GCM may waive or modify any of the terms relating to redemptions, including minimum amounts for all or any of the Shareholders in their discretion, without notice to the other Shareholders.

*NAV.* NAV is determined by the Administrator and is generally equal to the amount by which the value of our assets exceeds the amount of our liabilities. NAV determinations are made in accordance with GAAP, consistently applied (except that organizational expenses may be capitalized and amortized over a period of 60 months from the date of the Company's and the Fund's respective organizations).

## REDEMPTIONS

### PROCEDURE FOR THE REDEMPTION OF SHARES

Subject to any restrictions set out in this section and under "*Net Asset Value - Suspensions*" below, Shares may be redeemed at the option of the Shareholder on any Redemption Day falling after the expiration of the Lock-up Period.  The minimum redemption amount is $100,000.

A Shareholder wishing to redeem his / her Shares must send a completed Redemption Notice to the Administrator at the address specified in the Redemption Notice. The completed Redemption Notice must be received by no later than 5 p.m. (central standard time) on a Business Day falling at least 105 Business days (or such shorter period as GCM may permit, either generally or in any particular case) before the relevant Redemption Date. Unless

GCM agrees otherwise, any Redemption Notice received after this time will be held over and dealt with on the next relevant Redemption Date.

A Redemption Notice may be sent by facsimile but redemption proceeds will not be paid until the Administrator has received the original Redemption Notice. None of the Directors, the Company, the Fund or the Administrator accept any responsibility for any loss arising from the non-receipt or illegibility of any Redemption Notice sent by facsimile, or for any loss caused by or as a result of any action taken in connection with facsimile instructions believed in good faith to have originated from properly authorized persons.

If a Redemption Notice is received which would, if satisfied, result in the Shareholder retaining less than the Minimum Holding, the Directors may treat such Redemption Notice as a request for a partial redemption only up to the Minimum Holding or may redeem the Shareholder's entire holding of Shares. A request for a redemption of Shares with an aggregate Net Asset Value of less than $100,000 (or such lesser amount as the Directors may determine, either generally or in any particular case) will be refused. Shares of the relevant Class will be redeemed on a "first issued, first redeemed" basis.

Once a Redemption Notice has been received by the Administrator it may not be revoked by the Shareholder unless redemptions have been suspended in the circumstances set out in "*Net Asset Value - Suspensions*" below or the Directors otherwise agree.

### REDEMPTION PRICE & REDEMPTION PROCEEDS

The Redemption Price of a Share will be equal to the Net Asset Value per Share of the relevant series on the Valuation Day immediately preceding the relevant Redemption Date.

### REDEMPTION FEE

Generally, no redemption fee will be charged on the redemption of Shares.  However, GCM may, in its discretion, impose an early redemption fee of up to 5% of the amount to be redeemed for any redemption requested prior to the end of the Lockup Period.

### DEFERRAL OF REDEMPTIONS

If Redemption Notices are received in respect of any Redemption Date which, if satisfied in full, would result in redemptions in excess of the Redemption Gate, the Directors may limit redemptions to the Redemption Gate. Any such limitation will be applied on a *pro rata* basis amongst all Shareholders seeking to redeem Shares on the relevant Redemption Date.

Redemption Notices which are not satisfied in full will be carried forward to the next Redemption Date and will have priority over Redemption Notices received in respect of such Redemption Date. Shares will be redeemed at the Redemption Price prevailing on the Redemption Date on which they are redeemed.

## SETTLEMENT

Payment of redemption proceeds will normally be made within 45 Business Days of the relevant Redemption Date if the Administrator has received the original of the Redemption Notice and such other information and documentation as may be required. Payment will be made in U.S. Dollars by direct transfer to an account in the name of the Shareholder. Any costs incurred in making the transfer will be borne by the Shareholder. No redemption proceeds will be paid to a third party. No interest will be paid to the Shareholder in respect of redemption proceeds.

A Shareholder who requests a redemption of Shares that constitutes, together with prior redemptions within any fiscal year, less than 90% of the value of such Shareholder's Shares (at current NAV) will be paid within 45 days after the applicable Redemption Date.  A Shareholder who is redeeming 90% or more of the value of such Shareholder's Shares in the aggregate (at current NAV) within any fiscal year will be paid 90% of an amount estimated by the Directors to be the amount to which the redeeming Shareholder is entitled (calculated on the basis of unaudited data) within 45 days after the applicable Redemption Date.  The balance of the amount payable upon such redemption (and after audit adjustment for the year) will be paid, without interest, within 30 days after issuance of the December 31 audited financial statements for the fiscal year during which the redemption occurred.  Upon redemption of all of a Shareholder's Shares, the Shareholder will be deemed to have withdrawn from the Fund and from the Company, and upon notice of such redemption, a Shareholder will not be entitled to exercise any voting rights afforded to Shareholders under the Articles.

## PREVENTION OF MONEY LAUNDERING

Redemption proceeds will not be paid to a Shareholder until the Company has received any outstanding information or documentation requested in connection with any applicable anti-money laundering requirements or similar matters. None of the Directors, GCM or the Administrator will be liable for any loss arising as a result of any delay in payment of any redemption proceeds if such information and documentation has not been provided by the Shareholder.

The Company may refuse to pay redemption proceeds to a Shareholder if the Directors, GCM or the Administrator suspects or is advised that the payment of the redemption proceeds may result in a breach of any applicable laws or regulations in any relevant jurisdiction.

## RIGHTS FOLLOWING THE REDEMPTION DATE

From the relevant Redemption Date, a redeeming Shareholder will be treated as a creditor for the redemption proceeds of the Shares being redeemed (rather than a Shareholder) and will rank accordingly in the priority of the Fund's creditors. After the relevant Redemption Date, the redeeming Shareholder will have no rights as a Shareholder in respect of the Shares being redeemed save for the right to receive the redemption proceeds and any dividend which has been declared in respect of the relevant Shares prior to the relevant Redemption Date.

## COMPULSORY REDEMPTION

The Fund may, with or without cause and without giving any reason, redeem all or any of the Shares held by a Shareholder on any day designated by the Directors by giving prior written notice to such Shareholder.

In particular, the Fund may redeem the Shares held by a Shareholder if the Directors become aware that (i) the Shareholder has ceased to be an Eligible Investor, (ii) the Shareholder is holding Shares in breach of any law or requirements of any country, regulatory body or government authority, or (ii) the continued holding of Shares by the Shareholder would or may, in the opinion of the Directors, cause an undue risk of adverse tax, regulatory or other consequences to the Fund or any other Shareholders. Shareholders are required to notify the Company and the Administrator immediately if at any time they become aware that any of the above circumstances apply to them.

Where any fees, payment, withholding or deduction becomes payable out of the assets of the Fund because of a particular Shareholder, the Fund may redeem a portion of such Shareholder's Shares in order to pay such amount. In such circumstances, the redemption proceeds may be paid directly by the Fund to the relevant third party and not paid to the Shareholder.

## TRANSFER OF SHARES

Shares may not be transferred without the prior written consent of the Directors. The Directors may withhold their consent without giving any reason for doing so.

Shareholders wishing to transfer Shares must complete a transfer request, which shall be in such form as the Directors may from time to time approve. The completed transfer request, duly stamped, if applicable, together with such evidence as the Directors may require to show the right of the transferor to make the transfer, must be sent to the Administrator. If the transferee is not already a Shareholder, it will be required to complete a Subscription Agreement and comply with all eligibility and identification requirements for a subscriber for Shares.

The transfer will take effect upon the registration of the transferee in the register of Shareholders maintained by the Administrator.

The Directors may suspend the registration of transfers for not more than a total of 30 days in any year. No transfer will be registered if, as a consequence of such transfer, the Shares retained by the transferor or registered in the name of the transferee would be less than the Minimum Holding.

The transferor and transferee will be responsible for paying any taxes, duties, imposts or levies payable on, or in consequence of, a transfer of Shares.

## NET ASSET VALUE

### DETERMINATION OF NET ASSET VALUE

The Net Asset Value and the Net Asset Value per Share of each series will be calculated as at the Valuation Point on each Valuation Day.

For the purposes of determining the NAV of a Class, a separate accounting record will be established in the books of the Company in respect of each Class and each series. An amount equal to the proceeds of issue of each Share will be credited to the record for the relevant Class a series. Any increase or decrease in the Net Asset Value (disregarding for these purposes (i) any changes in the Net Asset Value due to subscriptions, redemptions or the payment of dividends and (ii) any designated adjustments (as described below)) will be allocated pro rata to the record for each Class based on the previous Net Asset Value of each Class. Those costs, expenses, losses, dividends, profits, gains and income which the Directors determine relate solely to a particular Class or series (the designated adjustments) will then be allocated to the record of the relevant Class or series.

Each series of each Class will typically have a different Net Asset Value per Share. Fees and expenses which relate to a particular series will be charged against that series when calculating its NAV. Other fees and expenses will be allocated pro rata between the series in accordance with their respective Net Asset Values or by such other method as the Directors consider equitable.

The Net Asset Value per Share on any Valuation Day will be calculated by dividing the Net Asset Value of the relevant series by the number of Shares of such series in issue, the resulting amount being rounded to two decimal places.

### VALUATION OF ASSETS

For the purposes of calculating the NAV, Fund's assets will be valued in accordance with the following principles:

- the loans will be valued at cost (e.g., the amount of cash we loan to borrowers) plus accrued interest;

- any security which is not listed or quoted on any securities exchange or similar electronic system or if, being so listed or quoted, is not regularly traded thereon or in respect of which no prices as described above are available will be valued at its probable realization value as at the Valuation Point, as determined by the Directors having regard to its cost price, the price at which any recent transaction in the security may have been effected, the size of the holding having regard to the total amount of such security in issue, and such other factors as the Directors deem relevant in considering a positive or negative adjustment to the valuation; investments, other than securities, which are dealt in or traded through a clearing house or exchange or through a financial institution will be valued as at the Valuation Point by reference to the most recent official settlement price quoted by that clearing house, exchange or financial institution. If there is no such price, then the average will be taken between the lowest offer price and the highest bid price as at the Valuation Point on any market on which such investments are or can be dealt in or traded, provided that where such investments are dealt in or traded on more than one market, the Directors may determine which market shall prevail;

- investments other than securities which are not dealt in or traded through a clearing firm or an exchange or through a financial institution will be valued by reference to the valuation obtained from an independent pricing source, but where no such valuation is available for a particular investment, the investment will be valued by comparing the latest available valuation provided by the relevant counterparty against the valuation provided by such other counterparties as the Directors deem appropriate. In the event that the valuations

provided respectively by the relevant counterparty and the other counterparties differ to an extent that the Directors consider to be material, the investment shall be valued on the basis of the average of all of the valuations but otherwise will be valued on the basis of the valuation provided by the relevant counterparty;

- deposits will be valued at their cost plus accrued interest; and

- any value (whether of a security or cash) which is not in US Dollars will be converted into US Dollars at the rate (whether official or otherwise) which the Administrator deem appropriate to the circumstances having regard, inter alia, to any premium or discount which it considers may be relevant and to costs of exchange.

The Directors may permit any other method of valuation to be used if they consider that such method of valuation better reflects fair value generally or in particular markets or market conditions.

The annual accounts of the Fund will be drawn up in accordance with IFRS. However, the valuation policies described above may not comply with IFRS. To the extent that the valuation basis deviates from IFRS, the Directors may make necessary adjustments in the annual financial statements in order to comply with IFRS. If relevant, a reconciliation note may be included in the annual financial statements to reconcile values shown in the annual accounts determined under IFRS to those arrived at by applying the valuation policies described above.

Subject to the discretions set out above, the Directors have delegated to the Administrator the calculation of the NAV and the Net Asset Value per Share.

## SUSPENSIONS

The Directors may declare a temporary suspension of (i) the determination of Net Asset Value per Share of one or more Classes, (ii) the redemption of Shares of one or more Classes, (iii) the payment of redemption proceeds, or (iv) the receipt of subscriptions. The Directors may declare any such suspension in such circumstances as they may deem appropriate, including:

(a) any period (other than customary closings) during which any securities exchange or similar electronic system on which a substantial part of the assets of the Fund are traded is closed or dealings are otherwise restricted or suspended;

(b) any period when, due to conditions of market turmoil or market illiquidity, it is not possible to determine the fair value of a substantial portion of

the assets of the Fund or during which the disposal of a substantial part of the assets of the Fund would not be reasonably practicable;

(c) any period when, due to a breakdown in the systems normally used to determine the Net Asset Value or for any other reason, it is not reasonably practicable to accurately determine the NAV;

(d) any period during which the business operations of GCM, the Administrator in respect of the Fund are substantially interrupted or closed due to pestilence, acts of war, terrorism, insurrection, revolution, civil unrest, riot, strikes or similar events;

(e) any period during which the proceeds of the sale or redemption of Shares cannot be transmitted to or from the Fund's account; or

(d) after the passing of a resolution to wind-up the Company.

Any suspension will take effect at the time the Directors specify in their declaration. The suspension will continue until the Directors declare that it has ended. The holders of Shares of the affected Class or Classes will be notified of any suspension as soon as practicable after the declaration of such suspension. Such Shareholders will also be notified when the period of such suspension has ended.

Applications for Shares for a Subscription Date falling within a period when the issue of Shares of the relevant Class is suspended will be acted upon on the first Subscription Day after the suspension has ended. A subscriber may withdraw his application for Shares during a period of suspension provided that a withdrawal notice is actually received by the Administrator before the suspension has ended.

Redemption Notices received prior to the commencement of a period of suspension will be carried forward to the next earliest relevant Redemption Date occurring after the suspension has ended. A Shareholder may withdraw his / her Redemption Notice during a period of suspension provided that a withdrawal notice is actually received by the Administrator before the suspension has ended.

While such suspensions may be temporary, the circumstances giving rise to the decision to suspend may continue for a prolonged period of time such that the Directors, in consultation with GCM, consider that it is appropriate that the suspension be declared permanent and the investments of the Fund be managed for the sole purpose of realizing all investments in anticipation of the termination of the business of the Fund.

## SUMMARY OF THE ARTICLES

### SHARE CAPITAL OF THE COMPANY

The Company has an authorized share capital of $50,000 which is made up of 100 Management Shares of $0.01 par value each and 4,999,900 participating shares of $0.01 par value each which may be issued in respect of different segregated portfolios and in different classes.

The Directors are authorized under the Articles to resolve from time to time the segregated Portfolio to which participating shares are attributable and the class to which participating shares are to be designated.

Subject to the provisions of the Articles and the Companies Law, the Company may increase or reduce its authorized share capital, divide all or any of its share capital into participating shares of a smaller amount or combine all or any of its share capital into participating shares of a larger amount.

The Articles provide that unissued participating shares are at the disposal of the Directors who may offer, allot, grant options over or otherwise dispose of them to such persons, at such times and for such consideration and upon such terms and conditions as the Directors may determine. All participating shares will be issued in registered form only.

There are no provisions under the laws of the Cayman Islands or under the Articles conferring pre-emption rights on the holders of participating shares or Management Shares. No capital of the Company is under option or agreed conditionally or unconditionally to be put under option.

### SEGREGATED PORTFOLIOS

The Articles provide that the Directors may from time to time establish one or more segregated portfolios. Each segregated Portfolio shall be separately designated by reference to a name that includes the words "Segregated Portfolio" or the letters "SP". The Directors shall identify:

(a) each asset as either a general asset or a portfolio asset and, in the case of a portfolio asset, the segregated portfolio to which it is attributed;

(b) each liability as being that of a creditor in respect of a particular segregated portfolio (a portfolio creditor) or a general creditor and in the case of a portfolio creditor, the segregated portfolio of which such person is a creditor.

The proceeds from the issue of participating shares of any class shall be applied to the segregated portfolio in respect of which the relevant class is issued. The assets and liabilities and income and expenditure attributable to that segregated portfolio shall be applied to such segregated portfolio and, subject to the provisions of the Articles, to no other segregated portfolio.

The assets held in each segregated portfolio shall be applied solely in respect of the liabilities of such segregated portfolio in accordance with the provisions of the Companies Law. Any surplus in a segregated portfolio shall be held, subject to the provisions of the Companies Law and the Articles, for the benefit of holders of participating shares attributable to such segregated portfolio.

Income, receipts and other property acquired by the Company and not otherwise attributable to a particular segregated portfolio shall be applied to and comprise the general assets of the Company. Liabilities of the Company which are not attributable to a particular segregated portfolio will be discharged from the general assets.

The Directors may transfer portfolio assets to the general assets in order to discharge the following liabilities: establishment costs and expenses of the Company, government registration fees, annual return fees, professional fees, service provider fees, the cost of insurance for the Directors, taxes, fines and penalties and any other liabilities necessarily incurred in maintaining the continued existence and good standing of the Company. If more than one segregated portfolio is in existence, portfolio assets will be transferred pro rata in proportion to the net asset value of each segregated portfolio or in such other proportions as the Directors may determine.

### RIGHTS OF THE MANAGEMENT SHARES

The Management Shares are held by GCM.  The Management Shares do not participate in the profits and losses of the Company and carry no right to dividends. On the winding up of the Company, the holder of a Management Share is only entitled to receive its paid-up capital of $0.01 per Management Share.  Management Shares are not redeemable.

Except as described under "*Modification of rights attaching to a Class*" below, the holders of the Management Shares have the right to vote (to the exclusion of the holders of the Shares) in respect of all matters relating to the Company.

### RIGHTS OF THE SHARES

Shares confer the following rights on Shareholders:

● **As to voting**. The holders of Shares have no right to vote except as described under "*Modification of rights attaching to a Class*" below.

● **As to income**. The holders of Shares have the right to receive dividends declared by the Company in

respect of the relevant Class. Shares within each Class carry an equal right to such dividends as the Directors may declare.

● **As to redemption.** The holders of Shares have the right to redeem the Share on the terms set out in this Memorandum and the Articles.

● **As to capital**. The holders of Shares have the right on the winding up or dissolution of the Company, to participate in the surplus assets of the Company attributable to the Fund. The surplus assets attributable to each Class will be distributed *pro rata* among the holders of Shares of that Class according to the number of such Shares held by each of them.

### RIGHTS OF THE ALLOCATION SHARES

Allocation Shares, if issued to GAM, would confer the following rights on GAM:

● **As to voting**. The holder of Allocation Shares has no right to receive notice of, attend or vote at any general meeting of the Company.

● **As to income**. The holder of Allocation Shares has the right to receive dividends declared by the Company in respect of the Allocation Shares, on terms agreed with GAM from time to time and disclosed to Shareholders.

● **As to redemption**. The holder of Allocation Shares will not have the right to redeem them.

● **As to capital**. The holder of Allocation Shares will not contribute capital to the Fund in exchange for such shares, and thus will not have the right to any capital respecting Allocation Shares.

### MODIFICATION OF RIGHTS ATTACHING TO A CLASS

The rights attaching to Shares of any Class, as described above, may only be modified with the consent in writing of Shareholders holding two-thirds of the Shares of the Class affected by the proposed modification or with the sanction of a resolution passed at a meeting of the holders of Shares of the Class affected by not less than two-thirds of the votes cast.

Seven days' prior notice will be given of any meeting of the holders of Shares of the relevant Class. The quorum will be one or more persons holding (or representing by proxy) not less than one-third of the issued Shares of the relevant Class. The Directors may treat two or more Classes as forming one Class if they consider that all such Classes would be affected in the same way by the proposals under consideration. At any meeting, all voting will be on a poll and each holder who is present in person or by proxy will have

one vote for every $1.00 of the aggregate Net Asset Value of the Shares held.

### SIDE LETTERS

The Company may enter into side letters with certain prospective or existing Shareholders whereby such Shareholders may be subject to terms and conditions that are more advantageous than those set out in this Memorandum. Such terms and conditions may, for example, provide for special rights to make future investments in the Fund; special redemption rights (whether relating to frequency, notice, a reduction or rebate in fees or otherwise) and/or rights to receive reports in relation to the Fund on a more frequent basis and such other rights as may be agreed with such Shareholders. The modifications are solely at the discretion of the Directors and may, amongst other things, be based on the size of the relevant Shareholder's investment in the Fund or affiliated investment entity, an agreement by the Shareholder to maintain such investment in the Fund for a significant period of time or other commitment by the Shareholder.

### AMENDMENTS TO THE ARTICLES

Except as described under *"Modification of rights attaching to a Class"* above, the holder of the Management Shares may, by special resolution, amend the Articles.

### WINDING UP & TERMINATION

The Company may voluntarily commence to wind up and dissolve by a special resolution of the holder of the Management Shares.

The Articles provide that the Company's business shall continue for so long as the Company holds assets, irrespective of whether the Directors have determined that the Company shall not acquire any further investments. Accordingly, the investments of the Company may be managed for the sole purpose of realizing all investments in anticipation of the termination of the business of the Company (the "**Realization**"). Unless the Directors consider it is in the best interests of the Company that it be placed into liquidation under the Companies Law, the Realization shall be managed by the Directors, together with, if the Directors so determine, the Manager. If the Directors determine that the Manager is to manage the Realization, the appointment of the Manager will continue on the terms of the agreement then in force unless the Directors determine otherwise.

### GENERAL MEETINGS

As a Cayman Islands exempted company, the Company is not required to hold annual general meetings of Shareholders.

### DIRECTORS' REPORT

The Company has not, since its incorporation, commenced operations, declared any dividends or made up any accounts. The Company does not have, nor since its incorporation has it had, any employees, nor is it expected to have any in the future.

Since its incorporation the Company has not been, nor is it currently, engaged in any litigation or arbitration. So far as the Directors are aware, no litigation or claim is pending or threatened against the Company.

### REGULATION

The Company is registered as a mutual fund under Mutual Funds Law §4(3) and is therefore regulated under that law. In connection with its initial registration under the Mutual Funds Law, the Company has filed with CIMA a copy of this Memorandum and certain details of this Memorandum, as required by the Mutual Funds Law. The Company has also paid the prescribed initial registration fee.

The Company's continuing obligations under the Mutual Funds Law are (i) to file with CIMA prescribed details of any changes to this Memorandum, (ii) to file annually with CIMA accounts audited by an approved auditor and an annual return containing certain key statistical data, and (iii) to pay the prescribed annual fee.

As a regulated mutual fund, the Company is subject to the supervision of CIMA. At any time, CIMA may instruct the Company to have its accounts audited and to submit them to CIMA within a specified time. Failure to comply with any supervisory request by CIMA may result in substantial fines. CIMA has wide powers to take certain actions if certain events occur. For instance, it has wide powers to take action if it is satisfied that a regulated mutual fund (i) is or is likely to become unable to meet its obligations as they fall due, or (ii) is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors.

The powers of CIMA include (i) the power to require a Director to be replaced, (ii) the power to appoint a person, at the expense of the Company to advise the Company on the proper conduct of its affairs, and (iii) the power to appoint a person, at the expense of the Company to assume control of the affairs of the Company, including for the purpose of terminating the business of the Company. CIMA also has other remedies available to it including applying to the courts of the Cayman Islands for approval of other actions, and requiring the Company to re-organise its affairs in a manner specified by CIMA.

### MATERIAL CONTRACTS

The following contracts, which are or may be material, have been entered into in respect of the Fund:

(a) the IMA between the Fund and GAM pursuant to which GAM was appointed to provide certain management services to the Fund;

(b) the Sub-Advisory Agreement among GCM, the Fund and FTM under which FTM was appointed as sub-adviser to provide the Fund and GCM with management services;

(c) the Primary Loan Agreement between the Fund and Primary Borrower;

(d) the Administration Agreement between the Fund and the Administrator pursuant to which the Administrator was appointed to provide administration services in respect of the Fund and to provide transfer agency services in respect of the Fund; and

(e) the NAV Calculation Agreement between the Fund and the NAV Calculation Agent under which the NAV Calculation Agent will provide the Fund with NAV calculation, accounting and back-office services.

These contracts are summarized in the section headed "*Management & Administration*" above.

### DOCUMENTS AVAILABLE FOR INSPECTION

Subject to any applicable confidentiality provisions, the following documents are available for inspection during normal business hours, on any day (except Saturdays, Sundays and public holidays) at the registered office of the Company:

(a) the Articles;

(b) the Companies Law and the Mutual Funds Law;

(c) the material contracts described above; and

(d) the most recent audited financial statements of the Fund.

Copies of these documents may be obtained free of charge from GCM.

### INQUIRIES

Inquiries concerning the Fund and this offering (including information concerning subscription procedures) should be directed to GCM at the address set out in the Directory.

## TAXATION

### GENERAL

The following is based on the Company's understanding of certain aspects of the law and practice currently in force in the Cayman Islands and the United States. The comments below are based on laws, regulations, guidelines, published administrative rulings and judicial decisions currently in effect, all of which may change or be subject to different interpretations, possibly with retroactive effect. Any such changes could adversely affect the comments made below. There can be no guarantee that the tax position at the date of this Memorandum or at the time of an investment will endure indefinitely.

In view of the number of different jurisdictions where local laws may apply to Shareholders, the comments below do not address the tax consequences to potential investors of the purchase, ownership and disposition of Shares. Prospective investors are urged to consult their own tax advisers in determining the possible tax consequences to them under the laws of the jurisdictions of which they are citizens, residents or domiciliaries, jurisdictions in which they conduct business and jurisdictions in which they purchase, hold, redeem or dispose of Shares. The comments below do not constitute tax advice.

### CAYMAN ISLANDS

The Company is not subject to any income, withholding or capital gains taxes in the Cayman Islands.

The Company is registered as an exempted company, limited by shares, under Cayman Islands law. As such, it has obtained an undertaking from the Governor-in-Cabinet that, for a period of 20 years from the date of the undertaking, no law subsequently enacted in the Cayman Islands that imposes any tax to be levied on profits, income, gains or appreciations will apply to the Company or its operations.

Shareholders will not be subject to any income, withholding or capital gains taxes in the Cayman Islands with respect to their Shares and dividends received on those Shares, nor will they be subject to any estate or inheritance taxes in the Cayman Islands. There are no exchange controls in the Cayman Islands.

### UNITED STATES

The following is a summary of certain aspects of the federal income taxation of the Fund and its Shareholders, which should be considered by a potential purchaser of Shares. A complete discussion of all tax aspects of an investment in the Fund is

beyond the scope of this Memorandum. The following summary is only intended to identify and discuss certain relevant issues.

This summary of certain tax considerations applicable to the Fund and its Shareholders is considered to be a correct interpretation of existing laws and regulations in force on the date of this Memorandum. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum or that any such future guidance or interpretation will not be applied retroactively.

The following summary is not intended as a substitute for careful tax planning. The tax matters relating to an investment in the Fund are complex and are subject to varying interpretations. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Shareholders will vary with the particular circumstances of each Shareholder. Accordingly, prospective investors must consult with and rely solely on their professional tax advisors with respect to the tax results of an investment in the Fund. In no event will GCM, its affiliates, counsel or other professional advisors be liable to any Shareholder for any federal, state, local, foreign or other tax consequences of an investment in the Fund, whether or not such consequences are as described below.

The following is a summary of certain material federal income tax consequences of acquiring, holding and disposing of Shares. Because the federal income tax consequences of investing in the Fund will vary from investor to investor depending on each investor's unique federal income tax circumstances, this summary does not attempt to discuss all of the federal income tax consequences of such an investment. It is urged that you review this tax discussion before making a decision regarding an investment in the Fund and consult with your tax advisors concerning the tax consequences of such an investment. This summary does not purport to discuss all of the potential tax consequences arising from the Fund's investments. Further, this summary does not purport to discuss federal tax consequences other than those arising under the federal income tax laws (such as estate and gift tax consequences). Finally, this summary does not discuss state, local or foreign tax consequences. You are therefore urged to consult your tax advisors to determine the federal, state, local and foreign tax consequences of acquiring, holding and disposing of Shares.

The following summary is based upon the Code, as well as the Regulations and rulings and judicial decisions thereunder, as of the date hereof, all of which are subject to change at any time (possibly on

a retroactive basis). Accordingly, no assurance can be given that the tax consequences to the Fund or its investors will continue to be as described herein.

The Fund has not sought nor obtained a ruling from the IRS (or any other federal, state, local or foreign governmental agency) or an opinion of legal counsel as to any specific federal, state, local or foreign tax matter that may affect it. Accordingly, although this summary is considered to be a correct interpretation of applicable law, no assurance can be given that a court or taxing authority will agree with such interpretation or with the tax positions we take.

This summary addresses certain federal income tax considerations relevant to an investment in the Fund by certain "United States persons," i.e., a person who is a citizen or a resident alien of the U.S., a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) organized under the laws of the U.S. or any political subdivision thereof, an estate whose income is subject to U.S. federal income tax regardless of its source or a trust if: (i) a U.S. court can exercise primary supervision over the trust's administration and one or more U.S. persons are authorized to control all substantial decisions of the trust or (ii) the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person. For purposes of this discussion, a "**U.S. Investor**" is an investor that is a United States person. A "**Non-U.S. Investor**" is an investor that is not a United States person. Except as set forth expressly herein, this discussion does not address the tax considerations relevant to an investment in the Fund by a Non-U.S. Investor.

### Classification of the Fund

The Fund intends to be treated as a partnership for federal income tax purposes and not as a corporation. Under Treasury Regulation § 301.7701-3, the Fund should be considered to be a business entity eligible to elect its classification. Accordingly, the Fund intends to elect to be treated as a partnership for U.S. federal income tax purposes.

There is no explicit authority addressing whether a Cayman Islands' exempted company and each segregated Portfolio are classified as separate entities for U.S. federal income tax purposes. However, the Company believes that there are substantial arguments in favor of classifying each segregated portfolio as a separate entity eligible to elect its separate classification for U.S. federal income tax purposes. Nevertheless, no assurance can be given that IRS would not assert that the Fund and the Company should be treated as a single entity or that IRS would not prevail in any such dispute.

In addition, certain partnerships may be taxable as

corporations for U.S. federal income tax purposes under Code § 7704's publicly-traded partnership rules if interests in such partnership are traded on an established securities market, or interests in such partnership are readily tradable on a secondary market. The Fund expects that under the facts and circumstances test in the Regulations, the Shares will not be readily tradable on a secondary market (or the substantial equivalent thereof) and therefore, the Fund will not be treated as a PTP under the Regulations. However, no assurance can be given that the IRS would not challenge this position and would not prevail in challenging this position.

If the Fund were classified as an association taxable as a corporation, it could be considered a "passive foreign investment company" ("**PFIC**"). If the PFIC provisions were applicable, U.S. investors could be required to treat all or a portion of the gain recognized on the sale of PFIC stock and the amount of any excess distribution as ordinary income. In addition, all or a portion of such income may become subject to an interest charge on the deferred tax amount.

In addition, if the Fund were classified as a corporation and if more than 50% of the voting power or value of the Fund was owned by U.S. persons that held 10% or more of voting power or value of the Fund, then the Fund could be considered to be a controlled foreign corporation ("**CFC**"). If the Company was considered to be a CFC, each U.S. person that held 10% or more of voting power or value of the Fund could be required to recognize its share of the Fund's net interest income annually, regardless whether the Fund made any distributions. U.S. persons that did not own 10% or more of the voting power or value of the Fund would still be subject to the PFIC rules, discussed above.

It is assumed in the following discussion of tax considerations that the Fund will be treated as a partnership for U.S. federal income tax purposes. The Fund has not sought and will not seek a ruling from the IRS with respect to its federal income tax status as a partnership.

### Taxation of Fund Investments

*Investment by U.S. Investors*

As a partnership, the Fund should not be subject to U.S. federal income tax. Each Shareholder that is a U.S. Investor is required to report separately on its income tax return its distributive share of net long-term capital gain or loss, net short-term capital gain or loss, net ordinary income, deductions and credits from the Fund. Since the Fund's activities will principally involving lending, its income should mainly consist of interest, treated as ordinary income.

*Investment by Non-U.S. Investors*

The Fund expects to principally earn interest income on the loans it makes. The Fund believes that this income will generally be considered U.S. source interest income which is not effectively connected with a U.S. trade or business. As a result, the portion of such interest which is allocable to a Shareholder will be subject to a gross basis tax of 30%, which our borrowers will be required to withhold from such payment, unless such Shareholder can demonstrate that either it is a Non-U.S. Investor and is entitled to a reduction or exemption from withholding or it is U.S. Investor. Shareholders will be required to demonstrate their status by providing the appropriate beneficial ownership certificates to the Fund, as required in the Subscription Booklet.

The Fund intends that interest paid to it on the loans will qualify for the portfolio interest exception to withholding tax under Code §§ 871(h) and 881(c) in the case of qualifying foreign shareholders. In general, a qualifying foreign shareholder is one which: (a) provides the Fund with a beneficial ownership certificate in the form prescribed in the Subscription Booklet, which certificate indicates that it is not a United States person, (b) is not a person who owns 10% or more of the total combined voting power of the stock of any borrower, directly or indirectly (including through attribution), (c) is not a bank extending credit in the ordinary course of its trade or business, and (d) is not a controlled foreign corporation which is related to a borrower (within the meaning of Code §864(d)(4)). If a Non-U.S. Investor does not qualify for the portfolio interest exception, it may qualify for a reduction in the rate of withholding tax if is a qualified beneficiary of an income tax treaty between the United States and such person's country of residence, provided that such person provides an appropriate beneficial ownership certificate to the Fund.

If the IRS were to successfully assert that the Fund was engaged in the business of lending through a fixed place of business in the U.S., the interest on the loans could be considered income which is effectively connected with a U.S. trade or business. In such case, Non-U.S. Investors could become subject to income tax in the United States on the interest income. In addition, Non-U.S. Investors which are foreign corporations could become subject to branch profits tax on the dividend equivalent amount of their effectively connected income under Code §884. While the Fund does not believe it will be treated as engaged in the business of making loans in the United States, no assurances can be given that IRS would not assert that the interest income is effectively connected with a U.S. trade or business or

that the IRS would not be successful in making such an assertion.

The Fund may also temporarily invest un-deployed capital in mutual funds or other types of portfolio investments between loan advances. In this case, Non-U.S. Investors could be subject to withholding tax on their distributive share of U.S. source interest, dividends and other fixed or determinable annual or periodical gains ("**FDAP**") pursuant to §§871 and 881 of the Code. Such tax is generally required to be withheld at source, unless a Non-U.S. Investor is a qualified beneficiary of an income tax treaty between the United States and such person's country of tax residence, and such person provides appropriate beneficial ownership documentation to the underlying fund.

THE TAX RULES GOVERNING INVESTMENTS BY NON-U.S. PERSONS ARE VERY COMPLEX. PROSPECTIVE INVESTORS SHOULD CONSULT THEIR OWN TAX ADVISORS TO UNDERSTAND THE SPECIFIC TAX CONSEQUENCES TO THE FUND UNDER U.S. FEDERAL, STATE, AND LOCAL INCOME TAX LAWS, AS WELL AS WITH RESPECT TO THE TREATMENT OF INCOME AND GAIN FROM SUCH INVESTMENT UNDER THE TAX LAWS OF ANY FOREIGN JURISDICTIONS IN WHICH SUCH INVESTOR MAY BE SUBJECT TO TAX.

*Investment by Tax-Exempt Entities.*

Before investing in the Fund, a tax-exempt investor should consider the special income tax rules applicable to it. The following discussion relates solely to the issue of UBTI and debt-financed income under the Code and no other federal, state or local income tax matters.

Qualified pension plans, individual retirement accounts and certain other tax-exempt entities, including those formed under Code §§401(a) and 501-503 ("**Exempt Investors**") are generally subject to federal income tax with respect to any UBTI (determined in accordance with Code §§511 - 514) and are required to file federal income tax returns if they have gross UBTI in excess of $1,000 whether or not any tax is actually due. UBTI includes income derived from a trade or business carried on by a tax-exempt entity or by a partnership of which the entity is a member. In addition, any gain or income earned from "debt financed" property is treated as income from an unrelated business even if such income would otherwise not be UBTI.

UBTI is generally the excess of gross income from any unrelated trade or business conducted by an exempt organization (or by a partnership of which the exempt organization is a member) over the deductions attributable to such trade or business. However, UBTI generally does not include dividends,

interest, annuities, royalties and gain or loss from the disposition of property other than stock in trade or property held for sale in the ordinary course of the trade or business, including a tax-exempt partner's distributive share of such items of a partnership. Accordingly, interest earned by the Fund would generally not be considered UBTI. It is possible; however, that IRS would assert that the Fund's activities constitute a trade or business of lending money and that the interest income derived thereby constitutes UBTI.  Although the Fund does not believe this is a significant risk, no assurance can be given that IRS would not make this assertion or that if such assertion were made, it would not be successful.

For certain types of tax-exempt entities, the receipt of any UBTI may have extremely adverse consequences. In particular, for charitable remainder trusts (defined under Code §664), the receipt of any taxable income from UBTI during a taxable year will result in the taxation of all of the trust's income from all sources for such year.  Other tax exempt entities such as qualified plans under Section 401(a) do not have a charitable purpose and should not be adversely affected by the receipt of UBTI aside from the taxation of such income.  Whether the receipt of UBTI by a tax-exempt entity has any effect upon that entity's tax-exempt status or upon the exemption from tax of its other income depends on the type of tax-exempt entity.  A tax-exempt investor should consult with its own tax advisors to determine whether the receipt of UBTI could have an adverse effect on its tax-exempt status.

As noted, a tax-exempt organization under Code §501(a) (and an IRA) also includes in its UBTI its "unrelated debt-financed income" (and its allocable share of the "unrelated debt-financed income" of any partnership in which it invests) under Code §514. In general, unrelated debt-financed income consists of (i) income derived by a tax-exempt organization (directly or through a partnership) from income producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year; and (ii) gains derived by a tax-exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness." Accordingly, while the Fund does not presently plan to borrow money to finance its lending activities, if it were to do so, income derived from the Fund could be considered debt-financed income and thereby UBTI.  In addition, if a tax-exempt investor acquires debt-financed shares in the Fund, such investor may have unrelated-debt financed income.

A Shareholder that is a tax-exempt entity (or an IRA) should consult its own advisers regarding the desirability of investing in the Fund.

### Shareholder Taxes

As noted above, each Shareholder that is a U.S. Investor is required to report separately on its income tax return its distributive share of net long-term capital gain or loss, net short-term capital gain or loss, net ordinary income, deductions and credits from the Fund.  Since the Fund's activities will principally involving lending, its income should mainly consist of interest, treated as ordinary income.

Each Shareholder that is a U.S. Investor will be subject to tax, and liable for such tax, on his or her distributive share of the taxable income of the Fund, regardless of whether the Shareholder has received or will receive any distribution of cash from such investment. Thus, in any particular year, a Shareholder's distributive share of taxable income from the Fund could exceed the amount of cash, if any, such Shareholder receives or is entitled to withdraw from the Fund.

Under Code §704, a Shareholder's distributive share of any Fund item of income, gain, loss, deduction or credit is governed by the partnership agreement unless the allocation provided by the partnership agreement does not have "substantial economic effect".  The Regulations promulgated under Code §704(b) provide certain "safe harbors" with respect to allocations, which, under the Regulations, will be deemed to have substantial economic effect.  The validity of an allocation which does not satisfy any of the "safe harbors" of these Regulations is determined by taking into account all facts and circumstances relating to the economic arrangements among the Shareholders.  If it were determined by the IRS or otherwise that the allocations provided in the partnership agreement with respect to a particular item do not have substantial economic effect, each Shareholder's distributive share of that item would be determined for tax purposes in accordance with that Shareholder's interest in the Fund, taking into account all facts and circumstances.

Cash distributions and withdrawals, to the extent they do not exceed a Shareholder's basis in his or her interest in the Fund, should not result in taxable income or gain to that Shareholder, but reduce the Shareholder's tax basis in the Fund interest by the amount distributed or withdrawn. Cash distributed to a Shareholder in excess of the basis of his or her Shares is generally taxable either as capital gain or ordinary income, depending on the circumstances.

Code §465 limits certain taxpayers' losses from certain activities to the amount they are "at risk" in the activities. Taxpayers subject to the "at risk" rules include individuals, S-corporations and certain

closely-held corporations. A Shareholder subject to the "at risk" rules will not be permitted to deduct in any year losses arising from his interest in the Fund to the extent the losses exceed the amount he is considered to have "at risk" in the Fund at the close of that year.

A taxpayer is considered to be "at risk" in any activity to the extent of his cash contribution to the activity, his basis in other property contributed to the activity and his personal liability for repayments of amounts borrowed for use in the activity. With respect to amounts borrowed for use in the activity, the taxpayer is not considered to be "at risk" even if he is personally liable for repayment if the borrowing was from a person who has an "interest" in the activity other than an interest as a creditor. Even if a taxpayer is personally liable for repayment of amounts borrowed for use in the activity, and even if the amount borrowed is borrowed from a person whose only interest in the activity is an interest as a creditor, a taxpayer will not be considered "at risk" in the activity to the extent his investment in the activity is protected against loss through guarantees, stop loss agreements, or other similar arrangements.

Each Shareholder will be at risk initially for the amount of his capital contribution. A Shareholder's amount "at risk" will be increased by his income from the Fund and will be decreased by his losses from the Fund and distributions to him. If a Shareholder's amount "at risk" decreases to zero, he can take no further losses until he has an "at risk" amount to cover the losses. A Shareholder is subject to a recapture of losses previously allowed to the extent that his amount "at risk" is reduced below zero (limited to loss amounts previously allowed to the Shareholder over any amounts previously recaptured).

### Medicare Tax on Net Investment Income.

A 3.8% U.S. federal tax is imposed on the "net investment income" of certain individuals, and on the undistributed "net investment income" of certain estates and trusts. Among other items, net investment income generally includes gross income from interest, dividends and net gains from certain property sales (including shares of stock), less certain deductions.

### Other Matters

We may incur certain expenses in connection with the organization of the Fund. Amounts paid or incurred to organize the Fund may be amortized, for U.S. federal income tax purposes, over a period of 180 months from the date we commence operations.

### State Taxation

In addition to the federal income tax consequences described above, prospective investors should consider potential state tax consequences of an investment in the Fund. No attempt is made herein to provide a discussion of such state tax consequences. State laws often differ from federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. Income of the Fund and gain or loss on a disposition of Shares in the Fund generally will be required to be included in determining a Shareholder's reportable income for state tax purposes in the jurisdiction in which he or she is a resident. Each prospective investor must consult his or her own tax advisors regarding such state tax consequences.

*Future tax legislation.* Future amendments to the Code, other legislation, new or amended Regulations, administrative rulings or guidance by the IRS, or judicial decisions may adversely affect the federal income tax aspects of an investment in the Fund, with or without advance notice, and retroactively or prospectively.

### Other Fund Taxes

Shareholders may be subject to other taxes, such as the alternative minimum tax, state and local income taxes, and estate, inheritance or intangible property taxes that may be imposed by various jurisdictions. Each prospective investor should consider the potential consequences of such taxes on an investment in the Fund. It is the responsibility of each prospective investor to become satisfied as to the legal and tax consequences of an investment in the Fund under state law, including the laws of the state(s) of his or her domicile and residence, by obtaining advice from his or her own tax advisors, and to file all appropriate tax returns that may be required.

### US Foreign Account Tax Compliance Act

Code §§1471 - 1474 (referred to as "**FATCA**") imposes a withholding tax of 30% on certain US-sourced gross amounts paid to certain "Foreign Financial Institutions", including the Fund, unless various information reporting requirements are satisfied. Amounts subject to withholding under these rules generally include gross US-source dividend and interest income, gross proceeds from the sale of property that produces dividend or interest income from sources within the US and certain other payments made by "Participating Foreign Financial Institutions" to "recalcitrant account holders" (so called "foreign pass thru payments").

The Cayman Islands Government has entered into a Model 1 intergovernmental agreement with the United States (the "**US IGA**") and implemented domestic regulations to facilitate compliance with FATCA. To comply with its obligations under

applicable legislation, the Fund will be required to report FATCA information to the Cayman Islands Tax Information Authority (the "**Cayman TIA**") which in turn will report relevant information to the United States Internal Revenue Service ("**IRS**"). To avoid withholding under FATCA, the Fund may request additional information from any Shareholder and its beneficial owners (that may be disclosed to the Cayman TIA and the IRS) to identify whether Participating Shares are held directly or indirectly by "Specified US Persons" (as defined in the US IGA) and report information on such Specified US Persons to the TIA. If the Fund is not able to comply with reporting requirements under the US IGA (whether due to a failure of one or more Shareholders to provide adequate information or otherwise), the Company could be deemed to be a "Non-participating Financial Institution" as a result of "significant non-compliance".  In such a situation the withholding tax under FATCA could be imposed on US-sourced amounts paid to the Company.

We reserve the right to take any action and/or pursue all remedies at our disposal to avoid withholding requirements or otherwise to mitigate the consequences of a Shareholder's failure to comply with FATCA, including compulsory redemption or withdrawal of the Shareholder concerned.  In this regard, GCM and the Fund have the right to request, and the Shareholders have the obligation to provide, information and documentation that may be used by GCM and the Fund to comply with their obligations under FATCA. INVESTORS SHOULD CONSULT THEIR TAX ADVISORS AS TO THE WITHHOLDING, FILING AND INFORMATION REPORTING REQUIREMENTS THAT MAY BE IMPOSED ON THEM IN RESPECT OF THEIR OWNERSHIP OF SHARES.

### OECD Common Reporting Standard Requirements Regarding Tax Reporting

The "Common Reporting Standard" ("**CRS**") was developed by the OECD to be an international standard for the automatic exchange of financial account information between relevant jurisdictions. Jurisdictions committed to the CRS (each a "**Participating Jurisdiction**") will either be a signatory to the multi-lateral competent authority agreement ("**MCAA**") or will sign bilateral competent authority agreements with certain other Participating Jurisdictions.

Under the MCAA (or the relevant bilateral agreement), Participating Jurisdictions will become "**Reportable Jurisdictions**" once they have implemented appropriate domestic legislation, put in place the necessary administrative and IT infrastructure (both to collect and exchange information and to protect confidentiality and

safeguard data) and provided the necessary notifications for exchange.  Participating Jurisdictions will have to collect and exchange relevant information with relevant Reportable Jurisdictions.

The Cayman Islands Government is a signatory to the MCAA and has implemented CRS through the Tax Information Authority (International Tax Compliance)("**Common Reporting Standards**") Regulations 2015, as amended (the CRS Regulations). Under the CRS Regulations, the Company will be required to make an annual filing to the Cayman TIA in respect of Shareholders who are tax resident in a Reportable Jurisdiction and/or whose "Controlling Persons" are tax resident in a Reportable Jurisdiction (unless one or more of the limited exemptions in the CRS Regulations apply).

The list of Reportable Jurisdictions for the Cayman Islands is available on the Cayman TIA website at http://www.tia.gov.ky/pdf/CRS_Legislation.pdf.

### Implications for Shareholders

In order to comply with the US IGA, the MCAA (or any relevant bilateral agreement) and the relevant domestic legislation (collectively "**AEOI Legislation**"), the Company may be required to disclose certain confidential information provided by Shareholders to the Cayman TIA, which in turn will report the information to the relevant foreign fiscal authority.  In addition, the Company may at any time require a Shareholder to provide additional information and/or documentation which the Company may be required to disclose to the Cayman TIA.

If a Shareholder does not provide the requested information and/or documentation, whether or not such failure actually leads to compliance failures by the Fund, or a risk of the Fund being subject to any withholding tax or other liability or being required to withhold amounts from distributions to be made to any Shareholder, the Fund may take any action and/or pursue any remedy at its disposal.  Such action or remedy may include the compulsory redemption of some or all of the participating shares held by the Shareholder concerned or the conversion of such participating shares into participating shares of another Class.

Shareholders are encouraged to consult their own advisors regarding the possible application of the AEOI Legislation and the potential impact of the same, on their investment.

## REGULATORY CONSIDERATIONS

### ERISA CONSIDERATIONS

An investment in the Fund by employee benefit plans subject to the provisions of Part 4 of Title I of ERISA and plans subject to Code §4975 of the Code (including individual retirement accounts ("**IRAs**")) or similar provisions under applicable state law (collectively, "**Plans**"), as well as entities the assets of which are treated as "plan assets" by reason of investment therein by Plan (collectively with Plans, the "**Benefit Plan Investors**") may raise issues under ERISA and the Code. ERISA and the Code impose certain duties on persons who are fiduciaries of a Plan and prohibit certain transactions involving the assets of a Plan and its fiduciaries or other interested parties. Under ERISA and the Code, any person who exercises any discretionary authority or control over the administration of a Plan, or the management or disposition of the assets of a Plan or who renders investment advice for a fee or other compensation to a Plan, is generally considered to be a fiduciary of the Plan.

In considering an investment in the Fund of a portion of the assets of any Plan, a Plan fiduciary should determine, in light of the risks and limited liquidity inherent in an investment in the Fund, whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA or similar law relating to a fiduciary's duties to the Plan. Furthermore, absent an exemption, the fiduciaries of a Plan should not purchase Shares with the assets of any Plan if GAM or any affiliate thereof is a fiduciary or other "party in interest" or "disqualified person" (collectively, a "**party in interest**") with respect to such Plan.

### Plan Assets

Regulations promulgated under ERISA by the U.S. Department of Labor ("**Plan Asset Regulations**") generally provide that when a Plan subject to Title I of ERISA or Code §4975 acquires an equity interest in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the 1940 Act, the Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established either that equity participation in the entity by Benefit Plan Investors is not "significant" or that the entity is an "operating company", in each case as defined in the Plan Asset Regulations. The Shares will not constitute "publicly offered" securities or securities issued by an investment company registered under the 1940 Act, and it is not expected that the Fund or that the Company will qualify as an "operating company" under the Plan Asset Regulations. For purposes of the Plan Asset Regulations, equity participation in an entity by benefit plan investors will not be "significant" if they hold, in the aggregate less than 25%, directly or indirectly, of the value of any class of such entity's equity, excluding equity interests held by persons (other than a Benefit Plan Investors) with discretionary authority or control over the assets of the entity or who provide investment advice for a fee (direct or indirect) with respect to such assets, and any affiliates thereof. For purposes of this 25% test ("**Benefit Plan Investor Test**"), the following are not included in the definition of a Benefit Plan Investor: pension plans maintained by foreign corporations, governmental plans, and certain church plans. Thus, absent satisfaction of another exception under the Plan Asset Regulations, if 25% or more of the value of any class of the Shares were held by Benefit Plan Investor, an undivided interest in each of our underlying assets would be deemed to be "plan assets" of any that invested in the Fund.

The Fund will endeavor to limit Benefit Plan Investor ownership of Shares of any Class to no more than 25% (or such greater percentage as may be specified in regulations promulgated by the Department of Labor ("**DOL**")) of the value of any class of equity interests in the Fund. If such threshold were exceeded, the assets of the Fund would be treated as "plan assets" for purposes of ERISA. Equity interests held by GAM or its affiliates (other than a Benefit Plan Investor) are not considered for purposes of determining the level of equity participation by Benefit Plan Investors in the Fund. If the aggregate investment in the Fund by Benefit Plan Investors does not equal or exceed the 25% threshold, neither the Fund nor GAM would be subject to the provisions of ERISA. As a general rule, if the assets of the Fund were treated as "plan assets" of a Benefit Plan Investor, GAM would be deemed a "fiduciary" (as defined in ERISA and the IRC) with respect to each ERISA Plan and IRA investing in the Fund.

Furthermore, there can be no assurance that notwithstanding our reasonable efforts, we will satisfy the Benefit Plan Investor Test, that the structure of our particular investments will otherwise satisfy the Plan Asset Regulations or that our underlying assets will not otherwise be deemed to include ERISA plan assets.

### Plan Asset Consequences

If our assets were deemed to be "plan assets" under ERISA, (i) the prudence and other fiduciary responsibility standards of ERISA would extend to investments we make and (ii) certain transactions in which we might seek to engage could constitute "prohibited transactions" under ERISA and the Code. If a prohibited transaction occurs for which no

exemption is available, GCM and any other fiduciary that has engaged in the prohibited transaction could be required (x) to restore to the Plan any profit realized on the transaction and (y) to reimburse the Plan for any losses suffered by the Plan as a result of the investment.  In addition, each party in interest involved could be subject to an excise tax equal to 15% of the amount involved in the prohibited transaction for each year the transaction continues and, unless the transaction is corrected within statutorily required periods, to an additional tax of 100%.  Plan fiduciaries that decide to invest in the Fund could, under certain circumstances, be liable for prohibited transactions or other violations as a result of their investment in Shares or as co-fiduciaries for actions taken by or on our behalf or GCM.  With respect to an IRA that invests in the Shares, the occurrence of a prohibited transaction involving the individual who established the IRA, or his or her beneficiaries, could cause the IRA, to lose its tax-exempt status.

Under the Articles, the Directors have the power to take certain actions to avoid having our assets characterized as plan assets, including the right to refuse a subscription, to the extent that the same may be feasible in any particular circumstance, exclude a Shareholder from an investment or to compulsorily redeem a Shareholder's Shares in the Fund.

Each Plan fiduciary should consult its own legal advisor concerning the considerations discussed above before making an investment in the Fund.

### 1933 ACT

The Shares offered hereby are "securities," as defined in the 1933 Act, and state securities laws.  The 1933 Act provides, among other things, that no sale of any securities may be made except pursuant to a registration statement that has been filed with the SEC, and has become effective, unless such sale (or the security sold) is specifically exempted from registration.  State securities laws have analogous provisions.

The offer and sale of the Shares have not been registered under the 1933 Act.  This Memorandum has not been reviewed by the SEC, nor has the SEC or any state securities commission or regulatory authority approved, passed upon or endorsed the merits of this offering.  The offering and proposed sale of Shares will be made to a limited number of investors: (i) in reliance upon the "private placement" exemption from registration provided in 1933 Act §4(a)(2) and Rule 506 of Reg. D (and, in the case of investors who are not US Persons, as provided in applicable local law and under Reg S); and (ii) where available, in

reliance upon appropriate exemptions from state registration or qualification requirements, or pursuant to registration or qualification under such state requirements.

To ensure compliance with the requirements for such exemption, Shares will be offered and sold only to investors who meet certain financial criteria and suitability requirements so as to qualify them as "accredited investors" within the meaning of Rule 501 of Reg. D and additional qualifications as required by investors' countries of residence.  Accordingly, in order to invest you must complete a Subscription Agreement confirming that you qualify as an "accredited investor" and meet other criteria specified therein.

### THE 1940 ACT

As of the date of this Memorandum, the Fund is exempt from the provisions of the 1940 Act under the exemption contained in §3(c)(1) thereunder, which exempts issuers with no more than 100 investors.  GCM may need to modify the structure or size of the Fund in order to maintain an exemption from the 1940 Act in the event the exemption the Fund now relies upon is modified by either the Congress or the SEC.

We cannot predict what Congress will further enact impacting unregistered funds, or what regulations the SEC or other agencies will adopt.  Similarly, we cannot predict the costs that will be imposed on GAM, GCM or the Fund to comply with such laws and regulations.

GCM anticipates organizing other funds exempt under the 1940 Act which may have similar or identical investment policies and strategies as we do.  Such other funds would have differing investor qualifications in order to remain exempt from registering under the 1940 Act.

### THE ADVISERS ACT & STATE LAW

Neither GCM, GAM nor FTM is presently registered as an investment adviser with the SEC or with any state.  GAM does anticipate registering in the future, though its registration status is not expected to adversely affect our activities.  In connection with GCM's and GAM's exemption from so registering under state law, Shareholders should be aware that neither GCM nor GAM will provide any services to individual Shareholders, but rather only to the Fund.  Further, GCM's and GAM's duties to individual Shareholders are limited to the provisions of the Articles and applicable Caymans law.

## PLAN OF DISTRIBUTION

### OFFER

Up to 4,999,900 Shares will be available for issue. Management Shares are not being offered for subscription under this Memorandum.

### SUBSCRIPTION PRICE & ISSUANCE

Shares are available for subscription on each Subscription Day at the relevant Subscription Price. A new series of Shares of each Class will be issued on each Subscription Day on which Shares of that Class are issued.

The Subscription Price will be equal to the Net Asset Value per Share of the Initial Series of the relevant Class as at the Valuation Day immediately preceding the Subscription Day on which the application is effective (and is exclusive of any Subscription Fee). If all Shares of the Initial Series are redeemed, the Directors may substitute another series as the Initial Series and may make such adjustments as they consider necessary to ensure that each series bears its proper proportion of the liabilities of the Fund.

### MINIMUM INVESTMENT

The minimum initial investment per subscriber is $250,000. The Directors may waive or reduce the minimum initial investment either generally or in any particular case. However, for so long as the Company is registered under Mutual Funds Law §4(3), the minimum initial investment cannot be less than $100,000.

The minimum amount of any subsequent subscription is $50,000 or such lesser amount as the Directors may determine, either generally or in any particular case.

### PAYMENT

Unless otherwise agreed by the Directors, payment for Shares must be made in cash, by electronic transfer. Any bank charges incurred in respect of electronic transfers will be deducted from the subscription monies and only the net amount will be invested in Shares.

All subscription monies must originate from an account held in the name of the subscriber. No third party payment will be permitted. Interest on subscription monies will accrue to the Fund.

### PROCESS

Subscribers for Shares and Shareholders wishing to purchase additional Shares must submit a signed and completed Subscription Agreement, together with any supporting documents, to the Administrator by 5 pm (CST) on the Business Day that is 10 Business Days before the applicable Subscription Day. In connection with the Subscription Agreement, investors will be required to submit to us a Purchaser Questionnaire which demonstrates the investor's suitability. Prospective investors may also be required to establish for securities law purposes their suitability as investors prior to acceptance of their subscriptions. This may include providing financial statements or other information.

If the completed Subscription Agreement, all documents required for the purposes of verifying the identity of the subscriber and source of the subscriber's funds and subscription monies in cleared funds are not received by the applicable time referred to above, the application will be held over to the Subscription Day following receipt of the outstanding documentation and/or subscription monies, as the case may be. Shares will then be issued at the relevant Subscription Price on that Subscription Day. The Directors may waive the requirements specified above, either generally or in any particular case.

Subscription Agreements may be sent by facsimile provided the original follows promptly. None of the Directors, the Company or the Administrator accept any responsibility for any loss arising from the non-receipt or illegibility of any Subscription Agreement sent by facsimile, or for any loss caused by or as a result of any action taken in connection with facsimile instructions believed in good faith to have originated from properly authorized persons.

Once a completed Subscription Agreement has been received by the Administrator it is irrevocable.

The Fund may reject any application in whole or part and without giving any reason for doing so. If an application is rejected, the subscription monies paid, or the balance thereof in the case of a partial rejection, will be returned (without interest) as soon as practicable to the account from which the subscription monies were originally remitted, at the risk and cost of the subscriber.

### FORM OF SHARES

All Shares will be issued in registered form, meaning that a Shareholder's entitlement will be evidenced by an entry in the register of Shareholders of the Company and not by a certificate. No certificates will be issued unless the Directors determine otherwise.

A Share may be registered in a single name or in up to two joint names. Where Shares are registered in joint names, the joint holders may authorize the Company to act upon the sole written instructions of any one of the joint holders in respect of the transfer or redemption of all or any of such Shares. Unless so

authorized, the Company will only act upon the written instruction of all the joint holders.

## ADDITIONAL INFORMATION

All original documentation concerning this Offering will be kept at the Company's offices. Representatives of each prospective investor may review those documents during normal business hours. The Company will answer any questions raised by prospective investors in connection with this offering and will provide them with any additional related information which is available to the Fund or which it can acquire without unreasonable effort or expense.

The Fund will offer and sell the Shares in the U.S. under a claim of exemption from the registration requirements of the 1933 Act in Rule 506 of Reg. D, and under similar exemptions available under the laws of the states in which it offers the Shares; and outside of the U.S. under Reg S. Each investor must sign the Subscription Agreement, in which it will represent certain facts as to itself, its investment intent and its lack of need for liquidity in an investment in the Shares.

## FINANCIAL SUITABILITY & NATURE OF INVESTORS

Shares are offered generally to corporations, trusts, high net worth individuals and partnerships, subject to the suitability standards in the Subscription Agreement and as summarized in this Memorandum. The Shares are designed for investors who can accept the risks associated with them. Each prospective Shareholder should understand the risks involved in the purchase of Shares and must evaluate whether such an investment is suitable in light of its business and investment objectives, financial situation, and needs.

The Fund will not accept any investment unless the investor has represented in writing that:

- The investor is acquiring the Shares for the investor's own account and such acquisition is not with a view to resale or distribution;

- The investor can bear the economic risk of losing the investor's entire investment;

- It has a reasonable basis for determining that investment in the Shares is suitable for the investor;

- The investor has no need for liquidity in the investor's investment in the Shares; and

- The investor establishes to the Fund's satisfaction that he/she/it qualifies as an "Accredited Investor" under Reg. D because the investor comes within one or more of the categories provided in the Subscription Agreement.

*Sales Outside the U.S.* We may also offer Shares to non-U.S. Persons under Reg S. In addition to the foregoing requirements, persons outside of the U.S. will be required in their Subscription Agreement to represent to the Fund that:

- the investor is not a U.S. Person;

- the investor is not acquiring the Shares for the account of any U.S. Person and the investor is not acquiring the Shares as a result of, and will not itself engage in, any "directed selling efforts" (as defined in Reg S) in the United States in respect of any of the Shares;

- the investor is outside the United States when receiving this Memorandum and executing the Subscription Agreement;

- none of the Shares so acquired may be offered or sold to a U.S. Person or for the account or benefit of a U.S. Person (other than a distributor) prior to the end of the expiration of a period of one year after the date of original issuance of the Shares;

- the investor acknowledges that the applicable securities laws of the authorities in the jurisdiction in which the investor is resident (the "**Jurisdiction**") do not require the Fund to make any filings or seek any approvals of any kind whatsoever from any securities regulator of any kind whatsoever in the Jurisdiction in connection with the issue and sale or resale of any of the Shares; and

- the investor understands that the Fund is under no obligation to prepare and file a prospectus or similar document, or any other report with respect to such purchase in the Jurisdiction or under any continuous disclosure reporting obligation in the Jurisdiction.

Additionally, investors will need to meet any qualification standards required by their Jurisdiction to enable the Fund to issue Shares in that Jurisdiction. Those standards are summarized in Exhibit A and as further provided in the Subscription Agreement respecting specific Jurisdictions.

*Special Note for Trusts, Partnerships and Certain Employee Benefit Plans:* The application of the "Accredited Investor" category to trusts (including Massachusetts or similar business trusts), partnerships and self-employed individual retirement plans is subject to complex regulatory interpretations and may differ under state and federal law. Accordingly, such an entity attempting to qualify may be required to deliver additional information, including a satisfactory opinion of its counsel.

These suitability standards represent minimum suitability requirements for prospective purchasers,

and their satisfaction does not necessarily mean that the Shares are a suitable investment for any organization.

The Fund reserves the right, in the Directors' discretion, to reject any potential investor and to require potential investors to furnish financial statements or other information before admission as a Shareholder.

Shares will not be issued or transferred to any person in circumstances which, in the opinion of the Directors, would or may cause an undue risk of adverse tax, regulatory or other consequences to the Company or any Shareholders.

### ISSUE OF SHARES

Written confirmation detailing the Shares which have been issued will be sent to successful subscribers as soon as practicable after the relevant Subscription Day.  Shares subscribed are deemed to be issued on the relevant Subscription Day.

Shares will be issued to two decimal places. Any smaller fraction of a Share that would otherwise arise will be rounded down, with the relevant subscription monies being retained for the benefit of the Fund.

### PREVENTION OF MONEY LAUNDERING

To ensure compliance with applicable requirements relating to anti-money laundering and anti-terrorism initiatives, the Company, or the Administrator on behalf of the Company, will require such information and documentation as it considers necessary to verify the identity and/or source of funds of each subscriber. In the event of delay or failure by the subscriber to produce any information required for verification purposes, the application may be refused or there may be a delay in processing the application. None of the Company, GCM, the Administrator or their respective delegates, agents and affiliates will be liable for any loss suffered by a subscriber arising as a result of any such refusal or a delay.

By subscribing for Shares, a subscriber consents to the disclosure of any information provided by the subscriber to government agencies, regulatory bodies and other relevant persons in connection with anti-money laundering requirements and similar matters. Such disclosure may be made by the Company, GCM, GAM, the Administrator or their delegates, agents or affiliates.

Each subscriber will be required to make such representations as may be required by the Company in connection with its anti-money laundering programs.  Such representations will include representations that the subscriber is not a prohibited country, territory, individual or entity listed on the United States Department of Treasury's Office of Foreign Assets Control ("**OFAC**") website and that it is not directly or indirectly affiliated with any country, territory, individual or entity named on an OFAC list or prohibited by any OFAC sanctions programmes. Each subscriber will also be required to represent that subscription monies are not directly or indirectly derived from activities that may contravene relevant laws and regulations, including anti-money laundering laws and regulations.

If, as a result of any information or other matter which comes to his or her attention during the course of his or her business, trade, profession or employment, any person resident in the Cayman Islands (including the Company) knows or suspects that a payment to the Company (by way of subscription or otherwise) constitutes or is derived from the proceeds of crime, such person is required to report such knowledge or suspicion pursuant to the Proceeds of Crime Law, 2018 of the Cayman Islands. Such a report shall not be treated as a breach of any restriction upon the disclosure of information imposed by law or otherwise.

An Anti-Money Laundering Compliance Officer, Money Laundering Reporting Officer and Deputy Money Laundering Reporting Officer have been appointed by the Company in respect of the Fund in accordance with the requirements promulgated by CIMA and details of the same are available on request from the Investment Manager at address specified in this Memorandum.

### RESTRICTIONS ON TRANSFERABILITY OF SHARES

The Articles restrict transfer of the Shares, as summarized below and as provided therein.  Further, no market may exist for the Shares, and the sale or transfer of Shares may result in substantial adverse tax consequences to the seller and in certain cases to all Shareholders.  The offer and sale of the Shares have not been registered under the 1933 Act, or the securities laws of any state or Jurisdiction in reliance on exemptions to the registration requirements of those laws.  Consequently, no resale or transfer will be permitted except in accordance with the 1933 Act and its associated rules and regulations, any applicable state securities laws, the laws of any Jurisdictions and the terms and conditions of the Articles.  Our records will be noted appropriately to refer to such restrictions on transferability to aid in the prevention of transfers without compliance with such restrictions.

## EXHIBIT A

THE INFORMATION IN THIS <u>EXHIBIT A</u> WAS PREPARED BASED ON A HYPOTHETICAL OFFERING STRUCTURE COMMONLY USED BY PRIVATE INVESTMENT FUNDS. THE FUND MAY UPDATE SUCH INFORMATION PERIODICALLY. POLSINELLI PC HAS RESEARCHED OR VERIFIED THE ACCURACY OR COMPLETENESS OF THE INFORMATION.

## <u>NOTE REGARDING MARKETING IN THE EUROPEAN UNION</u>

The Shares will not be offered or placed at the initiative of an Alternative Investment Fund Manager ("**AIFM**") (or on behalf of an AIFM) under the Alternative Investment Fund Manager Directive ("**AIFMD**") to prospective Shareholders in the EU.  **Shares will only be issued to those EU investors who request them at their own initiative pursuant to a bona fide reverse solicitation request made to the Fund, the Investment Manager or FTM.**

_____

### FOR PROSPECTIVE SHAREHOLDERS IN AUSTRALIA

The Fund is not, and is not required to be, a registered foreign body corporate in Australia, and this Memorandum is not a prospectus lodged or required to be lodged with the Australian Securities and Investments Commission. The Shares will only be offered in Australia to persons to whom such securities may be offered without a prospectus under Chapter 6D of the Corporations Act 2001 (Cth). The Shares subscribed for by investors in Australia must not be offered for resale in Australia for 12 months from allotment except in circumstances where disclosure to investors under the Corporations Act 2001 (Cth) would not be required or where a compliant prospectus is produced. Prospective investors in Australia should confer with their professional advisers if in any doubt about their position.

### FOR PROSPECTIVE SHAREHOLDERS IN AUSTRIA

The Shares may only be offered in the Republic of Austria in compliance with the provisions of the Austrian Capital Market Act ("**ACMA**"), the Austrian Investment Fund Act ("**AIFA**") and other laws applicable in the Republic of Austria governing the offer, issue and sale of the Shares in the Republic of Austria.  The Shares are being offered exclusively to a limited number of investors in Austria and are therefore not subject to the public offering requirements of the Austrian Capital Market Act or the Austrian Investment Fund Act. The Shares are not registered or otherwise authorized for public offer either under the ACMA, the AIFA or any other securities regulation in Austria. The recipients of this Memorandum and other selling material in respect to the Shares have been individually selected and are targeted exclusively on the basis of a private placement. This offer may not be made to any persons other than the recipients to whom this Memorandum is personally addressed. Any investor intending to offer and resell the Shares in Austria is solely responsible that any offer and resale takes place in compliance with the applicable provisions of the ACMA, the AIFA or any other applicable securities regulation.

### FOR PROSPECTIVE SHAREHOLDERS IN BELGIUM

The Fund has not been and will not be registered with the Belgian Financial Services and Markets Authority (_Autoriteit voor financiële diensten en markten / Autorité des Services Financiers et des Marchés)_ ("**FSMA**") as a foreign collective investment institution referred to under Article 127 of the Belgian Act of July 20, 2004 ("**Belgian 2004 Act**") relating to certain forms of collective management of investment portfolios. This Memorandum and the offering of the Shares have not been and will not be notified to, and have not been approved or disapproved by, the FSMA. The public offering of the Shares in Belgium within the meaning of the Belgian 2004 Act, and the Belgian Act of June 16, 2006 on the public offering of investment instruments and the admission of investment instruments to listing on a regulated market has not been authorized by the Fund. The offering may therefore not be advertised, and the Shares may not be offered, sold, transferred or delivered to, or subscribed to by, and no memorandum, information circular, brochure or similar document may be distributed to, directly or indirectly, any individual or legal entity in Belgium, except (i) subject to the restriction of a minimum investment of €250,000 per investor or (ii) in any other circumstances in which the present offering does not qualify as a public offering in accordance with the aforementioned Belgian 2004 Act. This Memorandum has been issued to the intended recipient for personal use only and exclusively for the purpose of the offering. Therefore, it may not be used for any other purpose, nor passed on to any other person in Belgium.

### FOR PROSPECTIVE SHAREHOLDERS IN CHINA

The Shares may not be marketed, offered or sold directly or indirectly to the public in China and neither this Memorandum, which has not been submitted to the Chinese Securities and Regulatory Commission, nor any offering material or information contained

herein relating to the Shares, may be supplied to the public in China or used in connection with any offer for the subscription or sale of the Shares to the public in China. The Shares may only be marketed, offered or sold to Chinese institutions which are authorized to engage in foreign exchange business and offshore investment from outside China. Chinese investors may be subject to foreign exchange control approval and filing requirements under the relevant Chinese foreign exchange regulations, as well as offshore investment approval requirements.

### FOR PROSPECTIVE SHAREHOLDERS IN DENMARK

This Memorandum has not been and will not be filed with or approved by the Danish Financial Supervisory Authority or any other regulatory authority in Denmark and the Shares have not been and are not intended to be listed on a Danish regulated market. The Shares have not been and will not be offered in Denmark under the AIFMD (as implemented into Danish law). Consequently, this Memorandum may not be made available and the Shares may not be marketed or offered for sale directly or indirectly to any natural or legal person in Denmark except as permitted under applicable rules.

### FOR PROSPECTIVE SHAREHOLDERS IN FINLAND

Shares will be offered in Finland exclusively to investors qualifying as "professional investors" as defined under the Finnish Act on Mutual Funds (*sijoitusrahastolaki,* 29.1.1999, as amended, the "**MFA**"). Accordingly, prospective investors should acknowledge that this Memorandum is not a fund prospectus as meant in the MFA and the marketing of Shares is not subject to marketing permission from the Finnish Financial Supervisory Authority (*Rahoitustarkastus;* "**FIN-FSA**"). Furthermore, even if Shares were to be construed as "securities" as defined in the Finnish Securities Markets Act (*arvopaperimarkkinalaki,* 14.12.2012/746, as amended, the "**SMA**"), based on the exemptions set forth in Decree 317/2012 issued by the Ministry of Finance, the offering of Shares would be exempted from the prospectus requirements of the SMA. Accordingly, prospective investors must acknowledge that this Memorandum is not a prospectus within the meaning set forth in the SMA. Prospective investors should also note that neither the sponsor of the Fund nor any of its affiliates is an investment firm (*sijoituspalveluyritys*) as meant in the Finnish Investment Services Act (*sijoituspalvelulaki* 747/2012) and they are not subject to the supervision of the FIN-FSA. The FIN-FSA has not authorized any offering for the subscription of Shares; accordingly, Shares may not be offered or sold in Finland or to residents thereof except as permitted by Finnish law. This Memorandum has been prepared for private

information purposes only and it may not be used for, and will not be deemed, a public offering of Shares. This Memorandum is strictly for private use by its holder and may not be passed on to third parties or otherwise distributed publicly.

### FOR PROSPECTIVE SHAREHOLDERS IN FRANCE

This Memorandum (including any amendment, supplement or replacement thereto) is not being distributed in the context of a public offering in France within the meaning of Article L. 411-1 of the French Monetary and Financial Code (*Code monétaire et financier)* ("**MFC**"). This Memorandum has not been and will not be submitted to the French *Autorité des marchés financiers* ("**AMF**") for approval in France and accordingly may not and will not be distributed to the public in France.  Pursuant to Article 211-3 of the AMF General Regulation, French residents are hereby informed that: (i) the transaction does not require a prospectus to be submitted for approval to the AMF; (ii) persons or entities referred to in Point 2, Section II of Article L.411-2 of the MFC may take part in the transaction solely for their own account, as provided in Articles D. 411-1, D. 734-1, D. 744-1, D. 754-1 and D. 764-1 of the MFC; and (iii) the financial instruments thus acquired cannot be distributed directly or indirectly to the public otherwise than in accordance with Articles L. 411-1, L. 411-2, L. 412-1 and L. 621-8 to L. 621-8-3 of the MFC.

This Memorandum is not to be further distributed or reproduced (in whole or in part) in France by the recipients of this Memorandum. This Memorandum has been distributed on the understanding that such recipients will only participate in the issue or sale of the Shares for their own account and undertake not to transfer, directly or indirectly, the Shares to the public in France, other than in compliance with all applicable laws and regulations and in particular with Articles L. 411-1 and L. 411-2 of the MFC.

### FOR PROSPECTIVE SHAREHOLDERS IN GERMANY

The Shares have not been notified for marketing in Germany with the German Federal Financial Supervisory Authority (*Bundesanstalt für Finanzdienstleistungsaufsicht;* "**BaFin**"). Therefore, no sale of Shares to German residents is permitted, unless the sale did not involve any "marketing" (as this term is construed under the German Capital Investment Code (*Kapitalanlagegesetzbuch;* "**KAGB**")) by any party (*i.e.,* where the investor invests in the Fund solely on his/her/its own initiative). Furthermore, a sale of Shares to professional or semi-professional investors resident in Germany is permitted if the marketing has not occurred on the initiative of the Investment Manager or on its behalf. Neither this Memorandum nor any other document relating to the Fund or the Shares may be circulated or supplied to persons

resident in the Federal Republic of Germany other than (i) in case an investor has contacted the Investment Manager solely on his/her/its own initiative or (ii) to professional or semi-professional investors by persons not acting on the initiative of the Investment Manager or on its behalf.

### FOR PROSPECTIVE SHAREHOLDERS IN GREECE

Neither the Fund nor this Memorandum has been, or is intended to be, registered with and approved by the Greek Capital Market Committee. The Shares are therefore not eligible for advertising, placement or public circulation in Greece. The information provided in this Memorandum is not an offer, or an invitation to make offers, to sell, exchange or otherwise transfer Shares in Greece to or for the benefit of any Greek person or entity. This Memorandum is not to be distributed or reproduced, in whole or in part, in Greece by the recipients of this Memorandum. This Memorandum has been distributed on the understanding that its recipients will only participate in the issue of the Shares outside of Greece on their own account and undertake not to transfer, directly or indirectly, the Shares to the public in Greece

### FOR PROSPECTIVE SHAREHOLDERS IN HONG KONG

The contents of this Memorandum have not been reviewed or approved by any regulatory authority in Hong Kong. This Memorandum does not constitute an offer or invitation to the public in Hong Kong to acquire Shares. Accordingly, unless permitted by the securities laws of Hong Kong, no person may issue or have in its possession for the purposes of issue, this Memorandum or any advertisement, invitation or document relating to the Shares, whether in Hong Kong or elsewhere, which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong other than in relation to Shares which are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" (as such term is defined in the Securities and Futures Ordinance of Hong Kong (Cap. 571) (the "**SFO**") and the subsidiary legislation made thereunder) or in circumstances which do not result in this Memorandum being a "prospectus" as defined in the Companies Ordinances of Hong Kong (Cap. 32) (the "**CO**") or which do not constitute an offer or an invitation to the public for the purposes of the SFO or the CO. The offer of the Shares is personal to the person to whom this Memorandum has been delivered by or on behalf of the Fund, and a subscription for Shares will only be accepted from such person. No person to whom a copy of this Memorandum is issued may issue, circulate or distribute this Memorandum in Hong Kong or make or give a copy of this Memorandum to any other person. You are advised to exercise caution in relation to the offer. If you are in any doubt about any of the contents of this Memorandum, you should obtain independent professional advice.

### FOR PROSPECTIVE SHAREHOLDERS IN ICELAND

This Memorandum has been issued to the recipient, for personal use only, exclusively in connection with a private placement of Shares. Accordingly, this Memorandum may not be used by the recipient for any other purpose nor forwarded to any other person or entity in Iceland. The offering of Shares described in this Memorandum is a private placement under Icelandic law and the Shares may only be offered and sold (as well as resold) in Iceland to institutional investors as provided under the Icelandic Act on Undertakings for Collective Investments in Transferable Securities (UCITS), Investment Funds and Funds Marketed to Institutional Investors No. 128/201 (the "**UCITS Act**"). Also, any subsequent transfer or resale of Shares in Iceland will need to comply with the applicable provisions of the UCITS Act. Prospective Icelandic investors should consult with their own tax advisers as to the tax consequences of an investment in the Fund.

### FOR PROSPECTIVE SHAREHOLDERS IN IRELAND

This Memorandum and the information contained herein are private and confidential and are for the use on a confidential basis only by the persons to whom such material is addressed. This Memorandum may not be reproduced, redistributed or passed on to any other person or published in whole or in part for any purpose. The offering of the Shares is being extended to a small number of persons resident in Ireland by way of private placement. This Memorandum does not constitute an invitation to the public in Ireland, or any section thereof, to subscribe for or purchase any shares or other securities in any company, and accordingly is not a prospectus within the meaning of the Prospectus Directive Regulations. This Memorandum does not constitute an offer or solicitation to anyone other than the addressee and does not constitute a facility for participation by the public in Ireland within the meaning of the Unit Trusts Act, 1990.

### FOR PROSPECTIVE SHAREHOLDERS IN ITALY

The Fund is not a UCITS fund. The offering of the Shares in Italy has not been nor will it be authorized by the Bank of Italy and the *Commissione Nazionale per la Società e la Borsa*. The Shares are offered upon the express request of the investor, who has directly contacted the Fund or its sponsor on the investor's own initiative. No active marketing of the Fund has been made nor will it be made in Italy, and this Memorandum has been sent to the investor at the

investor's unsolicited request. The investor acknowledges and confirms the above and hereby agrees not to sell or otherwise transfer any Shares or to circulate this Memorandum in Italy unless expressly permitted by, and in compliance with, applicable law.

### FOR PROSPECTIVE SHAREHOLDERS IN JAPAN

No public offering of the Shares is being made to investors resident in Japan and no securities registration statement pursuant to Article 4, paragraph 1, of the Financial Instruments and Exchange Law (the "**FIEL**") has been made or will be made in respect to the offering of the Shares in Japan. The Shares may not be offered or sold, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan unless they are offered or sold pursuant to an exemption from the registration requirements of, and in compliance with, the FIEL and any applicable laws and regulations of Japan. Neither the Financial Services Agency of Japan nor the Kanto Local Finance Bureau has passed upon the accuracy or adequacy of this Memorandum or otherwise approved or authorized the offering of the Shares in Japan or to investors resident in Japan.

For "Qualified Institutional Investors" (as defined in Article 2, Paragraph 3, Item 1 of the FIEL) and Article 10 of the Ministerial Ordinance Concerning Definitions Provided in Article 2 of the FIEL) who are solicited by way of private placement to Qualified Institutional Investors pursuant to the FIEL (i) no registration has been made with respect to the solicitation of applications to acquire securities under Article 4, Paragraph 1 of the FIEL since such solicitation falls under the category of Solicitation Only for Qualified Institutional Investors defined in Article 23-13, Paragraph 1 of the FIEL and (ii) the Fund and the investor will enter into an agreement stating that the investor may not transfer such Shares to a person other than a Qualified Institutional Investors.

For investors other than Qualified Institutional Investors or Qualified Institutional Investors who are solicited by way of a private placement to a small number of investors pursuant to the FIEL, no registration has been made with respect to solicitation of applications to acquire securities under Article 4, Paragraph 1 of the FIEL since such solicitation falls under the category of Solicitation Only for Small Number of Investors defined in Article 23-13, Paragraph 4 of the FIEL.

### FOR PROSPECTIVE SHAREHOLDERS IN KOREA

Neither the Company nor any of its affiliates is making any representation with respect to the eligibility of any recipients of this Memorandum to acquire the Shares under the laws of Korea, including the Foreign Exchange Transaction Law ("**FETL**") and Regulations

thereunder. The Shares have not been registered with the Financial Services Commission of Korea under the Financial Investment Services and Capital Markets Act of Korea, and none of the Shares may be offered, sold or delivered, or offered or sold to any person for re-offering or resale, directly or indirectly, in Korea or to any resident of Korea except pursuant to applicable laws and regulations of Korea. Furthermore, the Shares may not be re-sold to Korean residents unless the purchaser of the Shares complies with all applicable regulatory requirements (including governmental approval requirements under the FETL and its subordinate decrees and regulations) in connection with purchase of the Shares.

### FOR PROSPECTIVE SHAREHOLDERS IN LIECHTENSTEIN

The Shares have not been and will not be offered or sold, directly or indirectly, to the public in Liechtenstein. No public advertising or promotion was, is or may be carried out with respect to the Shares in Liechtenstein. This Memorandum does neither constitute a public offering nor a complete or simplified prospectus as understood pursuant to the Liechtenstein Investment Undertakings Act. Thus, the Shares may now and in the future not be offered to the public or by means of public advertising or promotion in Liechtenstein. By accepting this Memorandum, each Shareholder agrees irrevocably to the foregoing selling restrictions and conditions, concludes the subscription documents for the purchase of the Shares on their grounds and agrees to fulfill these conditions. In case of reselling the Shares to other persons in Liechtenstein, the Shareholder is obliged to transfer these obligations validly to any subsequent purchaser of such Shares.

### FOR PROSPECTIVE SHAREHOLDERS IN LUXEMBOURG

No public offering of the Shares is being made to investors resident in Luxembourg. The Shares are being offered only to a limited number of sophisticated and professional investors in Luxembourg. The *Commission de Surveillance du Secteur Financier* of Luxembourg has not passed upon the accuracy or adequacy of this Memorandum or otherwise approved or authorized the offering of the Shares to investors resident in Luxembourg.

### FOR PROSPECTIVE SHAREHOLDERS IN MONACO

No public offering of Shares is being made to investors resident in Monaco. Shares are being offered only to a limited number of institutional investors (*i.e.*, duly licensed banks and portfolio management companies), capable of understanding the risks of their investment. The *Commission de Contrôle des Activités Financières* of Monaco has not passed upon the accuracy or

adequacy of this Memorandum or otherwise approved or authorized the offering of Shares to investors resident in Monaco.

### FOR PROSPECTIVE SHAREHOLDERS IN THE NETHERLANDS

In the Netherlands, Shares may only be offered, sold, transferred or assigned, as part of their initial distribution or at any time thereafter, to natural persons who or legal entities which are "qualified investors", as defined in Section 1:1 of the Dutch Act on Financial Supervision (*Wet op het financieel toezicht*). Shares may not otherwise be offered, directly or indirectly, in the Netherlands.

### FOR PROSPECTIVE SHAREHOLDERS IN NEW ZEALAND

No public offering of the Shares is being made to investors in New Zealand. The Shares are being offered to investors in New Zealand pursuant to exemptions from the prospectus requirements under the Securities Act of 1978. The New Zealand Financial Markets Authority has not passed upon the accuracy or adequacy of this Memorandum or otherwise approved or authorized the offering of the Shares to investors resident in New Zealand.

### FOR PROSPECTIVE SHAREHOLDERS IN NORWAY

This Memorandum does not constitute an invitation or a public offer of securities in the Kingdom of Norway. It is intended only for the original recipient and is not for general circulation in the Kingdom of Norway. The offer herein is not subject to the prospectus requirements laid down in the Norwegian Securities Trading Act. This Memorandum has not been nor will it be registered with or authorized by any governmental body in Norway.

### FOR PROSPECTIVE SHAREHOLDERS IN PORTUGAL

This offering is addressed only to institutional investors, as so qualified pursuant to the Portuguese Securities Code (Decree Law 486/99 dated November 13, 2000, as amended), and a limited number of identified investors, and does not qualify as marketing of participation units in undertakings for collective investments, as per Article 1 No. 3 ex vi Article 15 of the Undertakings for Collective Investment Law.

### FOR PROSPECTIVE SHAREHOLDERS IN SINGAPORE

This Memorandum and any other material in connection with the offer or sale is not a prospectus as defined in the Securities and Futures Act, Chapter 289 of Singapore (the "**SFA**"). Accordingly, statutory liability under the SFA in relation to the content of prospectuses would not apply. Prospective investors should consider carefully whether an investment in the Fund is suitable for them. This Memorandum has not been registered as a prospectus with the Monetary Authority of Singapore (the "**MAS**") and this offering is not regulated by any financial supervisory authority pursuant to any legislation in Singapore. The Fund is not authorized or recognized by the MAS and the Shares are not allowed to be offered to the retail public. Accordingly, this Memorandum and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the Shares may not be circulated or distributed, nor may Shares be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under SFA §4A, (ii) to a relevant person under SFA §305(1), (iii) to any person pursuant to an offer referred to in SFA §305(2), or (iv) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA. Certain resale restrictions apply to the offer and investors are advised to acquaint themselves with such restrictions. Where the Shares are subscribed or purchased under SFA §305 by a relevant person which is:

- a corporation (which is not an accredited investor (as defined in SFA §4A)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

- a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor;

shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust will not be transferred within 6 months after that corporation or that trust has acquired interests pursuant to an offer made under Section 305 except:

- to an institutional investor or to a relevant person defined in SFA §305(5), or to any person pursuant to an offer that is made on terms that such shares, debentures and units of shares and debentures of that corporation or such rights and interest in that trust are acquired at a consideration of not less than S$200,000 (or its equivalent in a foreign currency) for each transaction, whether such amount is to be paid for in cash or by exchange of securities or other assets, and further for corporations, in accordance with the conditions specified in SFA §275;

- where no consideration is or will be given for the transfer; or

- where the transfer is by operation of law.

**FOR PROSPECTIVE SHAREHOLDERS IN SOUTH KOREA**

Neither the Fund nor any of its affiliates is making any representation with respect to the eligibility of any recipients of this Memorandum to acquire the Shares under the laws of Korea, including the Foreign Exchange Transaction Law and Regulations thereunder. The Shares are being offered and sold in Korea only to persons prescribed by Article 301, Paragraph 2 of the Enforcement Decree of the Financial Investment Services and Capital Markets Act, and none of the Shares may be offered, sold or delivered, or offered or sold to any person for re-offering or resale, directly or indirectly, in Korea or to any resident of Korea except pursuant to applicable laws and regulations of Korea. Furthermore, the Shares may not be re-sold to Korean residents unless the purchaser of the Shares complies with all applicable regulatory requirements (including governmental approval requirements under the Foreign Exchange Transaction Law and its subordinate decrees and regulations) in connection with purchase of the Shares.

**FOR PROSPECTIVE SHAREHOLDERS IN SPAIN**

The Shares may not be offered or sold in Spain except in accordance with the requirements of applicable Spanish law and the interpretations thereof by the Comisión Nacional del Mercado de Valores (the "**CNMV**"). This Memorandum is neither verified nor registered with the CNMV, and therefore no marketing or advertising activity, as defined by Act 35/2003, of 4 November, on collective investment schemes, with respect to the Shares will be carried out in Spain.

**FOR PROSPECTIVE SHAREHOLDERS IN SWEDEN**

This Memorandum has not been nor will it be registered with or approved by *Finansinspektionen* (the Swedish Financial Supervisory Authority). Accordingly, this Memorandum may not be made available, nor may the Shares offered hereunder be marketed and offered for sale in Sweden, other than under circumstances which are deemed not to require a prospectus under the Swedish Financial Instruments Trading Act (1991:980) (Sw. lag (1991:980) *om handel med finansiella instrument)* nor to constitute fund operations in Sweden under the Swedish Investment Funds Act (2004:46) (Sw. lag (2004:46) *om investeringsfonder)*. Accordingly, the offering of the Shares will only be directed to persons in Sweden who subscribe for Shares for a total consideration of at least €100,000 per investor.

**FOR PROSPECTIVE SHAREHOLDERS IN SWITZERLAND**

Under the Collective Investment Schemes Act dated June 23, 2006 and revised on September 28, 2012 (the "**CISA**"), the offering, sale and distribution to investors who are not qualified investors as defined by CISA Article 10 §3 and Article 6 of the Collective Investment Scheme Ordinance ("**CISO**") ("**Qualified Investors**") of units in foreign collective investment schemes in or from Switzerland are subject to authorization by the Swiss Financial Market Supervisory Authority ("**FINMA**") and, in addition, the distribution to certain Qualified Investors of interests in such collective investment schemes may be subject to the appointment of a representative and a paying agent in Switzerland. The concept of "foreign collective investment scheme" covers, *inter alia,* foreign companies and similar schemes (including those created on the basis of a collective investment contract or a contract of another type with similar effect) created for the purpose of collective investment, whether such companies or schemes are closed-end or open-end. There are reasonable grounds to believe that the Fund would be characterized as a foreign collective investment scheme under Swiss law. As the Shares have not been and cannot be registered with or authorized by FINMA for distribution to non-Qualified Investors, any offering of the Shares, and any other form of solicitation of investors in relation to the Fund (including by way of circulation of offering materials or information, including this Memorandum), must be restricted to Qualified Investors. Failure to comply with the abovementioned requirements may constitute a breach of the CISA. The Fund has not been and will not be registered with the FINMA. This Memorandum and/or any other offering materials relating to the Shares may be made available in Switzerland solely to Qualified Investors.

**FOR PROSPECTIVE SHAREHOLDERS IN TAIWAN**

The Shares have not been registered in the Republic of China, nor is approval by the Financial Supervisory Commission, Executive Yuan, the Republic of China ("**FSC**") compulsory. Subscribers should review the financial information and relevant documents, consult with an independent consultant, and bear the risks of this investment. Subscribers within the territory of the Republic of China are required to meet certain requirements set forth in the Rules Governing Offshore Funds and conditions promulgated by the FSC. Subscribers cannot resell the Shares (except in accordance with resale restrictions) nor solicit any other purchasers for this offering.

**FOR PROSPECTIVE SHAREHOLDERS IN THE UNITED KINGDOM**

This Memorandum is being distributed in the United Kingdom only to persons to whom it may lawfully be issued under The Financial Services and Markets Act 2000 (Financial Promotions) Order 2005 including

persons who are authorized under the Financial Services and Markets Act 2000 of the United Kingdom (the "**FSMA**"), certain persons having professional experience in matters relating to investments, high net worth companies, high net worth unincorporated associations and partnerships and trustees of high value trusts. This document is exempt from the prohibition in FSMA §21 on the communication by persons not authorized under the FSMA of invitations or inducements to engage in investment activity on the ground that it is being issued only to such types of person and only such persons may act on or rely on this document or any of its contents. The Fund is not regulated by the Financial Services Authority and investors may not have the benefit of the Financial Services Compensation Scheme and other protections afforded by the FSMA or any of the rules and regulations made thereunder.

**EXHIBIT B**
**SUBSCRIPTION BOOKLET**